Michael Peter **BROADRIBB**, Appellant,

v.

Sandra Jane **BROADRIBB**, Appellee.

No. S–7885.

Supreme Court of Alaska.

May 8, 1998.

**1224**

Patrick J. McKay, Law Offices of Patrick J. McKay, Anchorage, for Appellant.

Janet D. Platt, Law Offices of Janet D. Platt, Anchorage, for Appellee.

Before MATTHEWS, C.J., and COMPTON, EASTAUGH, FABE and BRYNER, JJ.

*OPINION*

FABE, Justice.

## I. *INTRODUCTION*

After twenty-four years of marriage, Michael and Sandra Broadribb, both British

citizens, divorced. Michael is a corporate executive and Sandra is a homemaker. In light of the length of their marriage and the discrepancy between the parties' earning capacities, the superior court awarded Sandra a greater share of the marital assets. Michael appeals five aspects of the court's property division: (1) the award of spousal support; (2) the award of survivor benefits; (3) the failure to consider potential tax consequences of exercising stock options; (4) the use of an approximate currency exchange rate; and (5) the finding that Michael began his employment in 1971. He also appeals the award of attorney's fees. We affirm.

## II. *FACTS AND PROCEEDINGS*

Michael and Sandra Broadribb are British citizens who married in 1971 in Wales, United Kingdom. At the time of the divorce, Michael was 46 years old and Sandra 48 years old. The parties moved to Anchorage in 1992 when Michael was transferred to Alaska by his employer, British Petroleum Exploration, Inc. (BP). The couple previously lived in Aberdeen, Scotland, where they purchased a home. At the time this appeal was filed, Michael continued to reside in Anchorage, but Sandra had returned to Aberdeen.

During their marriage, Sandra was the primary caretaker of the parties' three children.[1] Sandra completed her schooling at age sixteen with a typing certificate. After high school, she worked for two years as a receptionist and typist. Her last full-time job was as a receptionist in 1975. From 1976 to 1989, she was not employed outside the home. From 1989 to February 1992, she performed part-time clerical work at annual salaries from £3,000 to £6,879. In 1992 her hourly wage was approximately £3.90.[2] Sandra was unable to work from 1992 to 1996 in Anchorage due to visa restrictions.

Michael was the primary wage earner in the marriage. He is an executive at BP and has a degree in chemical engineering. Dur-

---

**1.** The parties share joint legal custody of their only remaining minor child, Peter. Peter attends boarding school in England. His vacations are divided equally between Michael and Sandra.

**2.** The parties agree that the proper exchange rate is between $1.50 and $1.55 per £1.

ing the marriage, he was promoted up the corporate ladder. His gross compensation in 1995 was $286,014.[3] He received a salary increase in 1996 and has earned and will continue to earn valuable BP shares, stock options, and other employment benefits, including a vested pension.

The parties separated in January 1995. In February 1995 Sandra filed a complaint for divorce. The case was tried by Superior Court Judge Brian Shortell over four days in June 1996. The divorce decree was issued in October 1996.

The court entered extensive findings. It found that Sandra was entitled to a greater share of the marital estate than Michael under AS 25.24.160(a)(4). Sandra was awarded assets, including the family home in Abderdeen, worth £273,563; Michael was awarded assets worth £165,241. The largest asset awarded to Michael was his BP pension and survivor benefits, with an actuarial present value of £132,082. The court concluded that under British law the benefits were not subject to a Qualified Domestic Relations Order or to division by the court so that Sandra "will not get her share of the pension (£27,000 or $40,000 per year) accrued during marriage." The court noted that Sandra had separate assets worth £21,977 and $7,521, and that Michael had separate assets worth £9,856 and $13,520.

The court also found that Sandra had presented evidence to show her reasonable living expenses in Aberdeen to be £31,689 (which the court estimated as $47,500) per year, as well as "start up" costs of £15,500. The court awarded Sandra maintenance of $3,000 per month for three years and $2,000 per month for two additional years. It also awarded her rehabilitative alimony in the amount of tuition and related charges at a vocational training program in Aberdeen. This award is contingent upon her enrollment in the program.

As of August 1996, Michael had incurred more than $41,000 in attorney's fees and costs, and Sandra had incurred in excess of $95,000. The court found that the discrepancy was justified and that Sandra's fees were

reasonable. At the time, Sandra still owed $55,695.05 of the $95,000 total. The trial court awarded Sandra $40,000 in attorney's fees.

Michael appeals several aspects of the court's division of property and the award of attorney's fees.

## III. DISCUSSION

### A. Standard of Review

In *Cox v. Cox*, 882 P.2d 909 (Alaska 1994), we summarized the standards of review for many of the elements of divorce proceedings as follows:

> The trial court has broad discretion in fashioning a property division in a divorce action. This court reviews the trial court's determination of what property is available for distribution under an abuse of discretion standard. If in the course of determining what property is available the trial court makes any legal determinations, such determinations are reviewable under the "independent judgment" standard. All questions of law are reviewed *de novo* with this court adopting the rule of law that is most persuasive in light of precedent, reason and policy. However, the trial court's findings that the parties intended to treat property as marital are disturbed only if clearly erroneous. The valuation of available property is a factual determination that should be reversed only if clearly erroneous. The equitable allocation of property is reviewable under an abuse of discretion standard and will not be reversed "unless it is clearly unjust."

*Id.* at 913–14 (citations omitted).

### B. Spousal Support

Michael advances two arguments relating to the superior court's award of spousal support: first, that the court failed to account for the investment value of the marital home; and second, that a portion of the maintenance payments should be characterized as rehabilitative alimony and should be made contin-

---

**3.** His gross compensation was $227,873 in 1992, $308,884 in 1993, and $292,621 in 1994. Michael's wages are not subject to deductions for FICA and medicare.

gent upon Sandra's enrollment in vocational training. We reject both arguments.

■■■ A trial court may award spousal maintenance as "just and necessary" to "fairly allocate the economic effect of divorce." AS 25.24.160(a)(2). In awarding spousal support, a trial court may consider, *inter alia,* the length of the marriage, the parties' respective earning capacities, and the division of property. *See* AS 25.24.160(a)(2)(A), (C), (F). "An award of alimony is within the trial court's discretion and will be set aside only if it is unjust or unnecessary." *Richmond v. Richmond,* 779 P.2d 1211, 1215 (Alaska 1989).

The superior court found that the available property in this case was insufficient to compensate Sandra adequately or to provide adequately for her reasonable future living expenses.[4] It further found that because Michael's pension is not subject to court division, Sandra "will not get her share of the pension (£27,000 or $40,000 per year) accrued during marriage." Given Sandra's age and limited earning capacity, the court concluded that "it is questionable whether she will accrue any substantial employer-provided pension in her remaining work years," and that she will therefore need to invest a significant sum to provide for her future needs. Against the backdrop of these findings, the court awarded Sandra spousal maintenance in the amount of $3,000 per month for three years, and $2,000 per month for two additional years. Based on its extensive findings regarding Michael's financial status, the court concluded that he would be able to pay this amount of maintenance.[5]

■■■ Michael argues that the superior court erred by failing to take into account the investment value of the family residence awarded to Sandra. He contends that the superior court should have attempted to meet Sandra's need for maintenance by ordering sale or rental of the home rather than

by ordering alimony payments. According to Michael, sale of the marital home would make £167,552 available for investment. He contends that at the "risk free investment rate" of 8.5%, the annual investment income from the sale proceeds of the home would be £14,660.

The superior court carefully considered and expressly rejected this argument. First, it found that retention of the home will provide stability and continuity for Sandra and their son Peter. Second, based on detailed findings regarding Sandra's financial needs, the superior court concluded that she will "need the equity in the home to help provide for her future retirement needs." Third, and most significantly, the court concluded that Michael's calculations failed to account for sale and moving expenses and for the cost of buying a more modest home.[6] The court observed that after taking these costs into account, Sandra would have less than £45,000 to invest. Even at Michael's suggested 8.5% interest rate, the investment income from this sum would be insufficient to cover Michael's spousal support obligation and to provide for Sandra's future needs.

The superior court's detailed findings provide ample support for its decision. We conclude that the superior court did not err in awarding the marital home and maintenance to Sandra rather than ordering sale or rental of the home.

■■■ Michael further argues that the $1,000–per–month difference between maintenance payments for the first three years and the maintenance payments for the following two years should be characterized as rehabilitative alimony and should be contingent upon Sandra's enrollment in vocational training.

We conclude that the graduated payments are justified as spousal support. The superior court's thorough findings regarding San-

---

4. The court found that Sandra's "future living expenses of £31,689 per year (approximately $47,500)" were reasonable and not convincingly refuted by Michael. The court noted that this amount is less than Sandra's actual annual living expenses since separation.

5. The court also observed that Michael will be able to deduct the gross amount of alimony payments on his United States income tax return.

6. Michael's argument that renting the home would generate £2,000 a month in income for Sandra also fails to account for such costs.

dra's financial needs and earning capacity and Michael's ability to pay alimony justify characterizing the award as spousal maintenance. As the $3,000–per–month award for the first three years falls well short of providing for Sandra's reasonable future living expenses of approximately $47,500 per year, it is not clearly unjust. The superior court found that Sandra will incur significant "start-up" costs as she adjusts to divorced life. Moreover, the court found that Sandra has been out of the work force for many years and possesses job skills "insufficient to enable her to obtain adequate employment to support herself." The gradual reduction of maintenance payments over several years is an appropriate means of aiding Sandra's adjustment to divorced life.

### C. *Survivor Benefits*

■ Michael's benefits plan includes survivor benefits payable only to his "spousal dependents" upon his untimely death. According to the testimony of the parties' accountant, the plan defines "spousal dependents" as including an ex-spouse, a current spouse, or a live-in acquaintance dependent upon Michael at the time of his death. The superior court found that "[t]he marital interest in survivor's benefits is a valuable asset that must be considered in valuing a vested retirement plan." Because the survivor benefits are not subject to court division, the court credited Michael with their actuarial present value.

Michael concedes that the "majority of these benefits were clearly earned during the marriage," and that the superior court "correctly viewed [these benefits] as being marital assets." He argues, however, that because the survivor benefits are payable only upon his death, he can never receive them and therefore they are of no value to him. He further contends that because Sandra may qualify as a spousal dependent upon his death, she may receive some of the benefits.

The survivor benefits are the equivalent of a vested life insurance policy without a redeemable cash value. Although Michael will not receive the benefits directly during his lifetime, they will provide for his spousal dependents upon his death, relieving him of the responsibility to make other arrangements for them. Thus, the survivor benefits are of value to Michael.

As they relate to Sandra, the survivor benefits merely function to insure that Michael is able to pay the maintenance award ordered by the court. Because only spousal *dependents* are eligible to receive the benefits, Sandra will only receive payment from the survivor benefits if Michael dies before he has fulfilled his spousal maintenance obligation to her. It appears from the record before us that she will receive survivor benefit payments in the place of, not in addition to, the maintenance payments she was awarded under the property division.[7] We conclude that the superior court did not err by crediting Michael with the value of the survivor benefits.

### D. *Tax Consequences*

Through his employer, Michael has options to purchase 6,677 shares of corporate stock at a price of £2.48 per share. In October 1996 the superior court noted that the price per share on the open market was £5.915. The options must be exercised between June 22 and December 21, 1998. The options are marital assets. The superior court ordered that if the market price exceeds the option price during that period, Michael must exercise the options and "equally divide any proceeds (market price minus contract price)" with Sandra. Michael argues that the court's failure to consider the tax consequences of exercising the options represents clear error. We disagree.

■ The superior court is required to consider only the "immediate and specific tax consequences of its division of property." *Oberhansly v. Oberhansly,* 798 P.2d 883, 887

---

7. The trial court ordered that Michael "shall maintain unencumbered life and disability insurance made payable to [Sandra] in an amount sufficient to secure and satisfy the balance of his financial obligations" to her. Michael is free to demonstrate to the superior court that the survivor benefits satisfy his obligation to provide insurance sufficient to assure payment of spousal support.

(Alaska 1990). Where tax consequences are speculative and not immediate, such that it is far from certain that a taxable event will occur, the superior court is not required to consider them. *See Money v. Money,* 852 P.2d 1158, 1163 (Alaska 1993).

██ The tax consequences associated with the exercise of the options are speculative. The only evidence presented concerning taxation was the testimony offered by the parties' personal accountant. He testified that if Michael were a resident of the United Kingdom, the shares acquired through the exercise of the options would not be taxed until they were sold, implying that the mere exercise of the options would not be a taxable event. Such a sale would be subject to the English capital gains tax. The accountant further testified that there is an annual £6,300 exclusion from the English capital gains tax. Thus, by selling the shares over a period of several years, Michael might avoid taxes altogether, even if he were a resident of the United Kingdom. No evidence was offered as to the tax consequences of exercising the options or selling the shares acquired through the exercise of the options if either or both of those acts occurred while Michael resided in the United States. Under these circumstances, the court did not err in failing to take the tax consequences concerning the options into account in dividing the marital property.[8]

### E. *The Currency Exchange Rate*

██ Michael argues that the superior court erred by employing the approximate currency exchange rate of $1.5 to £1.0 and that it therefore inaccurately valued the assets received by each party under the property division. He contends that the court should have employed a conversion rate of $1.55 to £1.0.[9]

We reject his argument. First, the superior court calculated the division of property such that British assets were valued in pounds and American assets were converted from dollars to pounds. As almost all of the parties' assets were already valued in British pounds, they were never converted from pounds into U.S. dollars. The currency exchange rate was therefore irrelevant to valuation of the majority of the parties' assets.[10]

Second, no evidence was presented at trial in support of Michael's proposed exchange rate. Michael's counsel merely referred to an unidentified newspaper as the basis for his proposed rate of $1.55 to £1.0. In the absence of evidentiary support for his proposed rate, there is no reasonable basis for believing that it is more accurate than the rate used by the trial court.

### F. *Michael's Date of Employment*

██ The superior court found that for the purposes of BP's severance program, Michael's employment began in June 1971. Michael disputes this finding, arguing that he worked for and was credited with employment by BP during the years he was a student, starting in 1968.[11]

The court based its finding on Michael's 1992 resume, which states that he has "21 years Operations/Technical/Safety experience

---

8. In support of his argument that the superior court failed to consider the tax consequences of exercising the option shares, Michael also relies upon the parties' accountant's testimony regarding taxation of "scheme shares." The accountant's testimony, however, indicates that the scheme shares are different than the option shares. Michael's reliance on this testimony is therefore misplaced.

9. For the purpose of determining future support payments, the court established that Michael may use an average currency exchange rate that has been in effect for thirty consecutive days at the time of the payment. Michael concedes that the court has therefore "taken care of what future problems may lie when one assumes an 'approximate' exchange rate of foreign monies,"

and thus alleviated the "most onerous effects" of the $1.50 currency exchange rate.

10. Michael was awarded $33,916 and Sandra $12,364 worth of assets originally valued in U.S. dollars. The value of these assets was converted from dollars into pounds for purposes of the property division.

11. Michael appears to raise this argument because the portion of the severance program benefits accrued during the marriage are a marital asset. Were Michael able to establish that the benefits began to accrue in 1968, three years before the parties were married, then a greater portion of the severance payments would not be considered marital assets divisible by the court.

within the petroleum industry with BP," and which lists his activity for the years 1968–71 as "University Student" in a "Chemical Engineering degree [program]." Furthermore, Michael offers no clear evidence that BP considers him to have begun employment in 1968.[12] In light of the evidence supporting the superior court's finding and in the absence of any clear evidence to the contrary, the court's conclusion that Michael began his employment with BP in 1971 was not clearly erroneous.

### G.  Attorney's Fees

■■■ An award of attorney's fees in divorce actions is within the broad discretion of the trial court. *See Wright v. Wright,* 904 P.2d 403, 410 n. 11 (Alaska 1995). On appeal, this court will not disturb an attorney's fee award unless it appears that the trial court's determination was manifestly unreasonable. *Id.*

■■■ Alaska Statute 25.24.140(a) empowers a trial court in a divorce action to require one spouse to pay another spouse's attorney's fees and costs.[13] *See Beard v. Beard,* 947 P.2d 831, 833 (Alaska 1997). Awards of attorney's fees in divorce cases are not based on the prevailing party rule. *See Hartland v. Hartland,* 777 P.2d 636, 644 (Alaska 1989). Rather, this court has repeatedly held that awards of attorney's fees "are to be based primarily on the 'relative economic situations and earning powers of the parties.'" *Beard,* 947 P.2d at 833 (quoting *Kowalski v. Kowalski,* 806 P.2d 1368, 1372 (Alaska 1991)). "This standard ensures that 'both spouses have the proper means to litigate the divorce action on a fairly equal plane.'" *Id.* (quoting *Lone Wolf v. Lone Wolf,* 741 P.2d 1187, 1192 (Alaska 1987)).

■■■ The superior court found that Sandra had incurred attorney's fees and costs in excess of $95,000, of which $55,695.05 was still owed to her attorney. The court awarded her $40,000 in partial payment of attorney's fees. The court based the award on its findings that Michael's earning power and economic status were far superior to Sandra's. Michael borrowed money and paid the $40,000 in full.

Michael argues that his current economic status is not substantially better than Sandra's because after the court's property division he was "left with no substantial liquid assets." We disagree. First, Michael was able to borrow money and pay the award of attorney's fees. This fact indicates that although he may not have had sufficient liquid funds to pay the award, his current economic status enabled him to do so. Second, his future earnings will enable him to repay the money he has borrowed. Moreover, although Sandra may have received liquid assets in the division of property sufficient to pay the $40,000, the court found that she will need to rely on these assets well into the future, as her earnings will be vastly smaller than Michael's and she is without a pension. We therefore conclude that the award of attorney's fees was not manifestly unreasonable.

### IV.  CONCLUSION

The judgment of the superior court is AFFIRMED.

---

**12.** Michael refers to "testimony from [the parties' accountant] that BP Exploration, Inc. considers Michael's employment to have begun in 1968." This testimony, however, is far from clear.

**13.** AS 25.24.140 provides in pertinent part:
　(a) During the pendency of the action, a spouse may, upon application and in ap-

propriate circumstances, be awarded expenses, including
　(1) attorney fees and costs that reasonably approximate the actual fees and costs required to prosecute or defend the action; in applying this paragraph, the court shall take appropriate steps to ensure that the award of attorney fees does not contribute to an unnecessary escalation in the litigation . . . .