**Sally K. SLOANE, Appellant,**

v.

**George R. SLOANE, Appellee.**

**No. S–9195.**

Supreme Court of Alaska.

. March 2, 2001.

Rehearing Denied April 4, 2001.

Michael R. Wirschem, Houston & Houston, Anchorage, for Appellant.

Susan D. Mack, Law Office of Susan D. Mack, Anchorage, for Appellee.

Before FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

### OPINION

CARPENETI, Justice.

## I. INTRODUCTION

Sally Sloane contests several aspects of the superior court's final judgment and a subsequent order regarding attorney's fees in her divorce from George Sloane. Because the superior court did not abuse its discretion or otherwise err with regard to any of the issues raised on appeal, we affirm the trial court's decision.

## II. FACTS & PROCEEDINGS

Sally Sloane (Sally) and George Sloane (George) were married on November 29, 1958, in Las Vegas. They have four adult children.

Beginning in 1955, George worked as a journeyman electrical lineman through the International Brotherhood of Electrical Workers union. He has worked in this capacity to the present, with a break in service from 1970 until 1982.

Sally was the primary care giver of the parties' children. Additionally, Sally has an extensive work history during the couple's marriage. Sally worked nearly forty hours a week at various family businesses doing administrative work during the 1970s. In addition, she worked as an accountant with the State of Nevada; she also has approximately

ten years experience as a real estate agent. Starting in 1991, Sally performed administrative work for a family business, Carts and Parts, Inc. (CPI). Sally moved to Idaho in 1996 to handle all of the preliminary work on the family's expansion of their airport storage business. She has a Bachelor of Arts degree in human resources development and an Associate of Arts degree in travel industry management.

The parties owned a number of small businesses during the marriage, including two equipment rental businesses, a parking lot sweeping business, and an airport storage business. Carts and Parts, Inc. was created in 1991 and was engaged in washing shopping carts, wire baskets, trucks, and heavy equipment. The couple's son Gary worked for CPI for six years. Gary agreed to buy CPI from his parents on April 3, 1997.

Both Sally and George benefitted from the CPI sale agreement. Sally was paid $10,000 for her ownership interest in CPI, and George received a note from CPI for $25,000 to compensate him for the estimated value of wages owed to him. The note was secured by issuance of one half of all of CPI's stock to George. George later sold the shares back to Gary for ten dollars.

Sally alleges that she suffers from numerous health problems. She complains of ongoing complications from a surgery in 1991 to remove her ovaries. She also claims that she requires surgery on her hands, toes, and nose. Sally presented evidence to the superior court that she suffers from various medical problems, including bilateral carpal tunnel syndrome, diabetes, hyperlipidemia, abnormal liver function, irritable bowel syndrome, and hiatal hernia.

The Sloanes separated permanently on December 20, 1996, and have been living as separate economic units since that time.

George Sloane filed for divorce on December 18, 1996. Both Sally and George were residents of the State of Alaska when the complaint was filed. On February 4, 1997, the court entered an order for interim spousal support requiring George to pay Sally $3,000 per month during the pendency of the

case. Between the entry of that order in February 1997 and trial in February 1999, George made direct payments of $44,500 and indirect payments (for which he received credit) of about $7,500. Accordingly, he accumulated arrearages of about $23,000 by the time of trial. The case was tried February 16–25, 1999.

The superior court entered its "Findings of Fact and Conclusions of Law" on May 27, 1999. Sally was awarded $412,270.02 of marital property, which equaled fifty-seven percent of the total.[1] The court's deviation from an equitable division was based upon George's greater earning potential. The trial judge intended to "give Mrs. Sloane approximately one-half of Mr. Sloane's income until a reasonable date of retirement."

In dividing the marital property, the court assigned the CPI note to George and ascribed the note a value of ten dollars. The court also ordered George to pay the $23,000 in spousal support arrearages with an additional $500 in interest.

In October 1999, the court issued an order awarding Sally attorney's fees of $3,186, an amount equal to one half the sum George's union legal fund paid for his fees along with extra expenses Sally incurred in preparing the post-trial paperwork.

Sally filed this appeal challenging six specific aspects of the superior court's final judgment and subsequent order of attorney's fees: (1) the valuation of the $25,000 note from CPI to George; (2) the decision to grant only fifty-seven percent of the marital assets to her; (3) an award of $500 in interest owed on missed interim support payments in lieu of a specific calculation of interest; (4) the denial of her claim for future medical and insurance expenses; (5) the award of attorney's fees; and (6) the failure to award money to reimburse her for relocation during litigation.

### III. STANDARDS OF REVIEW

■ The trial court has broad discretion in fashioning property divisions in divorce

---

1. George was awarded $310,001.31 of marital property.

actions.[2]  The valuation of marital property is a factual determination "which will not be set aside on appeal unless it is clearly erroneous."[3]  A valuation is clearly erroneous and should be set aside if the reviewing court is left with a definite and firm conviction on the entire record that a mistake has been made.[4]  The superior court's equitable distribution of property "is reviewable under the abuse of discretion standard, and we will not disturb the trial court's allocation 'unless it is clearly unjust.' "[5]

■  The award of attorney's fees in divorce actions is within the broad discretion of the trial court.[6]  An award of attorney fees will not be reversed unless it is arbitrary, capricious, or manifestly unreasonable.[7]

## IV.  DISCUSSION

A.  The Superior Court's Valuation of the Note from CPI to George Was Not Clearly Erroneous.

■  Sally argues that the $25,000 note from CPI was a marital asset that George unilaterally converted to a gift.  In the property division, the court valued the note at ten dollars and awarded it to George.

In April of 1997 the Sloanes sold CPI to Gary and memorialized the sale in a written agreement.  It provided that Sally would receive $10,000 and George would receive a note for $25,000.  In order to secure payment on the note, 10,000 of the 20,000 shares of CPI stock were transferred to George.  The note was meant to compensate George for wages and contributions made to CPI during the marriage.  George later sold the shares back to Gary for ten dollars.

Sally contends that the valuation of the note at $25,000 in the April 1997 sale agreement is determinative of the note's value.  She mistakenly relies upon our holding in *Money v. Money.*[8]  In that case, we held that a trial court may use a buy-sell agreement for valuation purposes,[9] but we did not go so far as to require the trial court to do so.  In fact, reliance on a buy-sell agreement often depends on the support of other valuation techniques.[10]  In *Brosnan v. Brosnan,*[11] we held that it was error for a trial court to assign a note its face value when both parties agreed that the note had little or no chance of actually being repaid.[12]

The superior court in this case heard extensive evidence regarding the April 1997 agreement for the sale of CPI.  At one point during George's testimony, the court directed specific questions to him regarding his attitude and expectation with regard to the agreement.  George testified that Sally's attorney prepared the agreement and presented it to him during a brief window of time before Sally was scheduled to leave on a flight.  He acknowledged that the equity in CPI likely was not $10,000 when it started and CPI was unlikely to have much revenue in the future.  George claimed that he intended for CPI to provide a solid foundation for Gary's future.  He testified that he had not requested the $25,000 note, that he did not believe that he would ever collect on it, and that it was included in the agreement only because Sally's attorney had done so.

The CPI sale agreement acknowledged that George and Sally were involved in divorce proceedings.  The agreement included a clause by which George waived his right to claim that the $10,000 Sally received from the sale was a marital asset.  Yet Sally now

2.  *See* AS 25.24.160(a)(4); *Berry v. Berry,* 978 P.2d 93, 95 (Alaska 1999).

3.  *Musser v. Johnson,* 914 P.2d 1241, 1242 (Alaska 1996).

4.  *See Money v. Money,* 852 P.2d 1158, 1161 (Alaska 1993); *Peters v. Juneau–Douglas Girl Scout Council,* 519 P.2d 826, 833 (Alaska 1974).

5.  *Berry,* 978 P.2d at 95 (citations omitted).

6.  *See Kowalski v. Kowalski,* 806 P.2d 1368, 1372 (Alaska 1991).

7.  *See Lone Wolf v. Lone Wolf,* 741 P.2d 1187, 1192 (Alaska 1987).

8.  852 P.2d 1158, 1161 (Alaska 1993).

9.  *See id.*

10.  *See id.*

11.  817 P.2d 478 (Alaska 1991).

12.  *See id.* at 480–81.

seeks contribution from George's proceeds of that same sale, and she seeks to value those proceeds at $25,000.

The circumstances surrounding the sale of CPI suggest that the value of the note was not $25,000. George signed the agreement under time constraints on terms determined unilaterally by Sally's attorney. And Sally has not presented any evidence to refute George's claim that CPI would not have sufficient funds to repay the note. The superior court did not commit clear error by holding that the value of the note was only ten dollars.

B. *The Superior Court's Division of the Marital Property Was Not an Abuse of Discretion or Clearly Unjust.*

1. *The superior court did not err in assigning fifty-seven percent of the marital property to Sally Sloane.*

The superior court awarded Sally fifty-seven percent of the marital property based primarily on the disparate earning capacity of the parties during the three years before George, then 62, reached retirement age. Sally argues that the court erred by not providing additional support to her because of her advanced age, station in life during the marriage, and health problems.

A property division must fairly allocate the economic effects of divorce by considering the *Merrill*[13] factors, as codified at AS 25.24.160(a)(4). Included in those factors is the "station in life of the parties during the marriage,"[14] as well as "the age and health of the parties."[15] A fifty-fifty distribution of marital assets is presumptively the most equitable,[16] but the superior court has broad discretion to divide the property unequally if it finds that such a division is just, based on the statutory factors.[17]

a. *Sally's age*

■ The superior court specifically considered Sally's age. However, the court did not find her age to be important because George is of a comparable age and both are approaching retirement. The superior court stated, "[s]he is 60 years old. I completely understand that. I factor that in just as if I factored in Mr. Sloane's age in terms of his capacity as well." Since the court is charged with the task of fairly distributing the effect of the divorce between two parties of equally advanced age, the fact that Sally was sixty years old, by itself, is insufficient grounds to challenge the court's finding. Sally has not presented a cogent argument to this court why her advanced age deserves any additional consideration beyond that given to it by the superior court.

Sally's reliance upon *Broadribb v. Broadribb*[18] is misplaced. In that case, we upheld a superior court's award of spousal maintenance payments. Mr. Broadribb's pension was not subject to court division, and Ms. Broadribb's age was relevant because at forty-eight she was likely too old to "accrue any substantial employer-provided pension in her remaining work years."[19] In this case, George's pension was subject to court division, so a consideration of Sally's age relative to her ability to earn her own pension is not relevant.

b. *Sally's station in life*

■ Sally also argues that the court did not consider her station in life during marriage. However, Sally neither raised this issue before the superior court nor presented evidence or argument in her briefs that would have made her station in life relevant to the property distribution. Accordingly, this argument has been waived.[20]

**13.** *See Merrill v. Merrill,* 368 P.2d 546, 548 n. 4 (Alaska 1962).

**14.** AS 25.24.160(a)(4)(A).

**15.** AS 25.24.160(a)(4)(B).

**16.** *See Miles v. Miles,* 816 P.2d 129, 131 (Alaska 1991).

**17.** *See Laing v. Laing,* 741 P.2d 649, 651 (Alaska 1987).

**18.** 956 P.2d 1222 (Alaska 1998).

**19.** *Id.* at 1226.

**20.** *See Adamson v. Univ. of Alaska,* 819 P.2d 886, 889 n. 3 (Alaska 1991).

### c. *Sally's health*

■ Finally, Sally argues that the superior court did not properly consider her health in making its findings. Sally contends that the court failed to consider the substantial evidence that she had presented about her non-surgical medical needs.

Sally's health is potentially relevant to the court's decision in two ways. It is relevant to her ability to work and support herself, and it is also relevant in considering health-related costs that Sally will incur in the future.

Contrary to Sally's assertions, the superior court did consider her health; it simply was not convinced that Sally needed any of the surgeries that she alleged. The court also commented that Sally's treatment at the Mayo Clinic might be overly expensive.

Sally has been able to work in an administrative capacity in family businesses for several years.[21] The superior court concluded that Sally's health concerns were not so serious as to prevent her from continuing to work in the future. The court found that Sally's medical records did not necessarily support her health concerns. A review of the medical evidence presented to this court supports the superior court's findings. Despite the fact that Sally continually alleged the need for several surgeries, not a single medical document that she presented to the court clearly states that need. In addition, the medical evidence on which Sally relies does not conclusively state the consequences of her ongoing health concerns. Without such definite support for her health claims, the trial court's finding that Sally would be able to work in the future was not clearly erroneous.

■ Moreover, even if the court's conclusion that Sally was capable of being gainfully employed was incorrect, it would be harmless error. In calculating and dividing the marital estate, the court valued Sally's future earnings at zero. Therefore, it was not reversible error for the court to award fifty-seven percent of the marital property to Sally based upon health problems that may keep her from working in the future.

### 2. *The superior court did not err by failing to award Sally Sloane additional money for ongoing medical needs.*

Sally raises two arguments with regard to the way the superior court dealt with her claims for ongoing medical needs. First, she argues that the superior court failed to properly consider her claim for COBRA[22] premiums and future medical expenses because the court disposed of those requests based on its division of marital property rather than considering those claims independently under the provisions of AS 25.24.160(a)(2). Second, she argues that the superior court improperly denied her proposal to bifurcate the divorce proceeding.

### a. *Future medical costs*

■ Sally claims that the property division was based exclusively on the earning capacity of the parties and did not consider their relative expenses. She claims that she will have to pay $579 a month in COBRA premiums that her husband will not have to pay because such benefits will be covered as a part of his employment. Sally also complains that she will have considerable medical expenses after the divorce.

With regard to the COBRA premiums, the superior court found "that because Mrs. Sloane has received in excess of 50% of the marital estate and because she is capable of being gainfully employed, she should be responsible for these premiums." The property division favoring Sally awarded her one-half of George's estimated earnings until retirement. In addition, because the court estimated her own income at zero, she will have available any income that she earns from her

---

21. Indeed, the superior court noted that Sally's abilities in this regard surpassed George's.

22. Federal law requires employers to offer divorced spouses of employees optional participation in the employer's group health plan for a limited time. *See* 29 U.S.C. §§ 1161–1163.

Since this provision was originally contained in the Consolidated Omnibus Budget Reconciliation Act in 1986 (Pub.L. No. 99–272), these continuing benefits are commonly referred to as COBRA benefits.

own employment during that period. In light of that division, we hold that it was not error for the superior court to decline to require George to pay Sally's COBRA premiums.

With regard to Sally's claim for other future medical expenses, the court noted that Sally's continued coverage under COBRA would cover ninety percent of her future medical costs. Sally argues that "after the three years COBRA coverage expired she would be virtually uninsurable." But the evidence she presents fails to specifically demonstrate that she will have medical costs that she will not be able to pay. Sally's speculation that she will be "uninsurable" is not supported by estimates of coverage from private independent insurance companies, consideration of government medicare benefits, or any other evidence.

Since the superior court found that Sally was capable of work but did not ascribe any value to her future income in the property division, the superior court did not abuse its discretion in finding that Sally should be able to provide for her future medical needs from this income. Sally has not presented sufficient evidence to establish that she faces medical costs that will exceed what she will be able to pay.

We upheld a property division on facts very similar to those presented here in *Davila v. Davila.*[23] In that case, Ms. Davila suffered from chronic foot problems and presented evidence of over $100,000 in costs that she would face for attorney's fees and costs, rehabilitation, hospital bills, and health insurance.[24] Despite this showing, the superior court held that a distribution of property amounting to $132,683 in assets was sufficient to cover plaintiff's health expenses.[25] In part, our decision was based on the fact that the plaintiff failed "to demonstrate that her needs have not been met as a result of this distribution."[26] This case appears to present an equally reasonable decision by the

superior court. Sally's share of the property distribution exceeds $400,000 and she has not presented evidence of costs approaching the $100,000 claimed by Ms. Davila. As a result, Sally has not established that the trial court's distribution was clearly unjust.

### b. *Request for bifurcation*

■ Sally argues that the superior court improperly rejected her proposal for a bifurcation of the legal divorce. Specifically, she asked the court to divide the property immediately, but to delay the legal divorce for three years. This arrangement would allow her to continue health insurance as a spouse under George's coverage without having to pay COBRA premiums.

The court rejected that request. The court concluded that divorce should be granted when parties inform the court that they are unable to remain married, and that to delay granting divorce for financial or insurance reasons like this "would be illegal, . . . kind of a fraud."

Sally relies upon AS 25.24.155(a)(2) to permit the requested bifurcation. However, that statutory provision is wholly inapplicable to the purposes intended here. Alaska Statute 25.24.155(a)(2) limits the situations in which custody determinations or property divisions in divorce proceedings can be reserved until later. Other statutes specifically permit reservation of custody decisions or property divisions,[27] but no statute permits the reservation of a divorce decree.

The superior court's finding that there was an incompatibility of temperament between the parties and that it was impossible for them to live together as husband and wife is not disputed. Under the circumstances, George was entitled to a decree of divorce pursuant to AS 25.24.050(5)(C). Thus, it was not error for the court to refuse the bifurcation request.

---

23. 908 P.2d 1027 (Alaska 1995).

24. *See id.* at 1034.

25. *Id.* at 1034.

26. *Id.* at 1033.

27. *See* AS 25.24.150(f) (allowing reservation of child custody decisions only if standards in AS 25.24.155(a) are met); AS 25.24.160(c) (permitting reservation of property division if requirements of AS 25.24.155(a) are met).

3. *The court's refusal to reimburse Sally for expenses incurred in traveling to Alaska for litigation was not arbitrary, capricious, or manifestly unreasonable.*

Sally was a resident of Alaska when this action was filed. The trial was held over a period of six days in February of 1999. Sally has lived in Idaho since 1996. She argues that the superior court improperly rejected her claim for travel and living expenses from February to May of 1999 incurred by attending the trial in Alaska. The superior court summarily denied any award or consideration of a partial award on this point. Sally argues that her request should have received more consideration than the court's statement: "I'm not going to award anything for that."

However, Sally has failed to point to any law supporting her right to have these expenses reimbursed. At best, Sally makes a request for additional trial costs that should be rejected.[28] In the absence of any legal support for her claim, the decision of the superior court was not error.

C. *The Superior Court Did Not Err by Granting $500 Interest for Late Support Payments Rather than Using a Specific Calculation.*

Prior to trial, George was ordered to pay Sally $3,000 per month in interim spousal support. George did not make all such payments.[29] The parties agree that as of February 1999 George owed a total of approximately $23,000 to Sally. The court ordered George to pay this amount in four installments between March and June 1999. When Sally requested that the statutory interest rate run on those payments, the court ordered that an additional $500 in interest be added to the final payment.

In her brief to this court, Sally contends that additional interest is owed for the varying periods prior to judgment when those support payments were in arrears. Howev-

er, that is not the objection that Sally made to the award of interest in the trial court. To the extent that her argument was preserved below, it was an argument for post-judgment interest.

Sally objected to $500 as an award of post-judgment interest which would accrue from the time of the award in February to its final payment in June. Her objection to this amount of interest in the court below was based on her concern that the interest would be more if George failed to make the payment in June. The court informed Sally that it would quickly rectify the situation if she reported that George had not paid. Since the only argument that Sally has preserved through her objection below is a complaint about post-judgment interest, and because George paid the amount ordered by the court, which was slightly more than post-judgment interest calculated at the statutory rate, we find no error.

D. *The Allocation of Attorney's Fees to Sally Was Not Arbitrary, Capricious, or Manifestly Unreasonable.*

Sally argues that the award to her of $3,186—one-half the amount George received from his union legal fund—for attorney's fees was insufficient. Since the money George received from his union legal fund is marital property, Sally argues, she deserves one-half of that money by right. The fact that the court refused to give her any more money, Sally continues, is tantamount to a complete refusal of her request for attorney's fees.

This court's opinion in *Sanders v. Sanders*[30] governs in divorce cases like this one where the property division is based primarily on the relative economic situation and earning power of each party. Generally, if the parties are in comparable economic situations, each side should bear its own costs.[31] The superior court's property division giving fifty-seven percent of the marital property to Sally was intended to put the parties in a comparable economic situation;

---

28. *See* discussion *infra* Part D.

29. Of the $75,000 in interim payments ordered, George paid $44,500 in direct support and approximately $7,500 in indirect support.

30. 902 P.2d 310 (Alaska 1995).

31. *See id.* at 318–19.

therefore, no additional attorney's fee awards were warranted. The award to Sally of one-half of George's receipts from the union legal fund was consistent with an equal division of the assets to parties on equal economic footing.

 Sally also argues that the marital property award is insufficient because she owes over $40,000 in fees. Yet part of the rationale behind the fee rules in divorce cases is the desire to allow the parties to litigate on a "fairly equal plane." [32] Having leveled the playing field, it does not make sense to hold one party liable for the litigation choices and expenses of the other. Such tactical decisions by one party do not "demonstrate the financial disadvantage that justifies an attorney's fee award in a divorce case." [33] The superior court's award of attorney's fees clearly was not capricious, arbitrary, or manifestly unjust.

## V. CONCLUSION

The superior court's valuation of the note from CPI to George was not clearly erroneous, its division of martial property was not clearly unjust, and its treatment of the interest and attorney's fees issues was legally correct. For these reasons, we AFFIRM the decision of the superior court in all respects.

---

**32.** *Broadribb,* 956 P.2d at 1229.

**33.** *Sanders,* 902 P.2d at 319.