This decision was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court and does not include the filing date.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                              **No. 29,978**

**MARIO CHAVEZ,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Richard J. Knowles, District Judge**

McGarry Law Office
Kathleen McGarry
Glorieta, NM

for Appellant

Gary K. King, Attorney General
Nicole Beder, Assistant Attorney General
Santa Fe, NM

for Appellee

## DECISION

**DANIELS, Justice.**

{1} This case comes before us on Defendant Mario Chavez's direct appeal of his convictions for crimes related to the killing of realtor Garland Taylor, who was shot and killed in August of 2004 inside a vacant house he was showing at 11107 Pino Avenue in Northeast Albuquerque. *See* N.M. Const. art. VI, § 2 ("Appeals from a judgment of the district court imposing a sentence of death or life imprisonment shall be taken directly to the supreme court."); *accord* Rule 12-102(A)(1) NMRA. A jury found Defendant guilty of first-degree murder, contrary to NMSA 1978, Section 30-2-1(A)(1) (1994); armed robbery, contrary to NMSA 1978, Section 30-16-2 (1973) and NMSA 1978, Section 31-18-16 (1993); and five counts of tampering with evidence, contrary to NMSA 1978, Section 30-22-5 (2003). He was sentenced to life imprisonment for the murder conviction, nine years plus a one-year firearm enhancement for the armed robbery conviction, and three years for each tampering conviction, all to be served consecutively for a total incarceration of life imprisonment plus twenty-five years.

{2} Defendant argues (1) that his conviction and sentencing for five counts of tampering with evidence constitutes double jeopardy; (2) that the district court abused its discretion under Rule 11-404(B) NMRA and Rule 11-403 NMRA by admitting into evidence the testimony of six witnesses about his prior statements and conduct, a written crime plan referred to as the "Woo Script," and evidence pertaining to

Defendant's communications and obsessions regarding hit men, the Mafia, and the Gambino crime family; and (3) that the district court improperly admitted three out-of-court statements contrary to the hearsay rules.

**{3}** We find all of Defendant's arguments to be meritless. Because the issues raise no novel issues of law that are not already addressed sufficiently in New Mexico precedents, we issue this unpublished decision affirming Defendant's convictions pursuant to Rule 12-405(B) NMRA.

**I. BACKGROUND**

**{4}** The lock box on the front door of the vacant house located at 11107 Pino Avenue showed that the victim, Garland Taylor, entered the house at 9:00 a.m. on August 16, 2004. The next-door neighbors, Jane and Bill Kellerman, knew Mr. Taylor had the house listed for sale and noticed his car there early that morning. Shortly after Mr. Taylor arrived at the scene, a light-colored four-door sedan with Arizona license plates arrived. The Kellermans watched as a well-dressed man got out, retrieved a black bag from the vehicle, shook Mr. Taylor's hand, and walked into the house with him. The Kellermans left to run errands, and when they returned home around noon, Mr. Taylor's car was the only one parked at 11107 Pino.

**{5}** At 6:30 p.m., Mrs. Kellerman noticed that Mr. Taylor's car was still parked at

the house, and she "knew something was wrong." Mrs. Kellerman called Mr. Taylor's wife, who said she had been trying unsuccessfully to get in touch with her husband since noon. Mrs. Taylor drove to 11107 Pino and entered the house. Inside the front door there was a large pool of blood and from it a trail of blood down the hall, through a bedroom, and into a double closet, where Mrs. Taylor found her husband's body.

{6}     Both of the victim's pant legs were pulled up from the ankles, as if someone had grabbed his ankles and dragged him into the closet. His left rear pants pocket was turned inside out, and his wallet was missing. Another of his pants pockets contained a business card with the name "Martin Cordova" handwritten on the back. The victim's wallet was found three days later in the men's locker room at the Jewish Community Center in Tucson, Arizona, a facility that Defendant's father-in-law and former business partner admittedly visited on the very day of its discovery there.

{7}     The ensuing investigation led police to Defendant and his friend, Eloy Montano. Montano inculpated Defendant in a number of videotaped statements that were later admitted into evidence at trial by the defense. Montano explained that Defendant first killed the victim by himself and then picked up Montano and drove him to the scene of the crime, where Montano saw the victim's body lying on the floor just inside the front door. After Defendant dragged the body to the back of the house,

4

he and Montano left the scene in Defendant's car and drove to a Smith's grocery store parking lot where Montano's truck was parked. Defendant and Montano got into Montano's truck, leaving Defendant's car in the parking lot. The men returned to Defendant's car later that day, and Defendant removed the license plate from his car and threw it into the trunk.

{8}     The next day, Defendant's grandmother, Victoria Chavez, called a towing company and had them tow the car to her house and push it into her backyard. Detectives subsequently found a towing receipt on top of a refrigerator at her house, indicating that she had the car towed for repairs on August 17, 2004, without a license plate. Detectives also found an Arizona license plate at Victoria Chavez's house on the top shelf of a bedroom closet.

{9}     Montano directed detectives to the murder weapon, a handgun that was located near Tramway Boulevard and Interstate 25 in Albuquerque, nearly one-hundred feet away from the pavement. A forensic firearm and tool mark examiner testified at trial that he was positive a cartridge casing collected from the floor at 11107 Pino was fired from the handgun.

## II.  DISCUSSION

### A.  Defendant's Convictions of Five Counts of Tampering with Evidence Do Not Constitute Double Jeopardy.

{10} Defendant was convicted of tampering with each of five pieces of evidence: (1) the handgun, (2) the victim's body, (3) Defendant's vehicle, (4) the vehicle's license plate, and (5) the victim's wallet. Defendant contends that his multiple convictions under the tampering statute violate the double jeopardy guarantees found in both the United States Constitution and the New Mexico Constitution. "A double jeopardy claim is a question of law that we review de novo." *State v. Bernal*, 2006-NMSC-050, ¶ 6, 140 N.M. 644, 146 P.3d 289.

{11} The double jeopardy clauses protect "against multiple punishments for the same offense" by preventing "the sentencing court from prescribing greater punishment than the legislature intended." *Swafford v. State*, 112 N.M. 3, 7, 810 P.2d 1223, 1227 (1991) (internal quotation marks and citations omitted). "In 'unit of prosecution' cases, where a defendant is charged with multiple violations of a single statute, we inquire whether the [L]egislature intended punishment for the entire course of conduct or for each discrete act." *State v. DeGraff*, 2006-NMSC-011, ¶ 32, 139 N.M. 211, 131 P.3d 61 (alteration in original) (internal quotation marks and citation omitted).

6

{12}     In two recent cases, *DeGraff*, 2006-NMSC-011, ¶¶ 32, 35, and *State v. Saiz*, 2008-NMSC-048, ¶ 39, 144 N.M. 663, 191 P.3d 521, *abrogated on other grounds by State v. Belanger*, 2009-NMSC-025, 146 N.M. 357, 210 P.3d 783, this Court reaffirmed that a defendant could be convicted of multiple tampering offenses if they were separated by sufficient "indicia of distinctness." Indicia of distinctness may "include the timing, location, and sequencing of the acts, the existence of an intervening event, [and] the defendant's intent as evidenced by his conduct and utterances[.]" *State v. DeGraff*, 2006-NMSC-011, ¶ 35.

{13}     In *DeGraff*, the defendant was convicted of five counts of tampering based on the following conduct:  throwing a box from his car containing three items, a knife, a glass, and a hammer; leaving the car on the side of the road on his return trip; and hiding his clothing in his van the next morning at his house. *Id.* ¶¶ 36-37. This Court looked at the defendant's actions to determine whether they were separated by sufficient "indicia of distinctness" to allow for multiple convictions and concluded that the defendant's conduct consisted of three distinct acts, supporting three convictions, because the defendant hid evidence at three different times in three separate locations. *Id.* ¶¶ 35-37. The defendant's disposal of the box containing the hammer, knife, and glass was properly considered a single course of conduct and thus

7

only supported one tampering conviction. *Id.* ¶¶ 38-39.

{14}     Likewise, in *Saiz*, 2008-NMSC-048, ¶ 36, the number of tampering convictions upheld by this Court was based primarily on the timing and location of the defendant's actions. The defendant's conviction on nine counts of tampering with evidence was based on the following conduct:

> (1) cleaning blood from various surfaces in classroom P-17; (2) placing bloody items from P-17 in a trash dumpster 100 feet away; (3) painting over blood evidence on wooden blocks in P-17; (4) cleaning blood from building P-51; (5) cleaning blood from classroom K-1; (6) cleaning blood between school buildings K-1 through K-3; (7) hiding bloody items in trash bags in the janitor's closet; (8) hiding and cleaning his clothing at his home the next day; and (9) removing and disposing of [the victim]'s body.

*Id.* We upheld three of the defendant's nine tampering convictions, based on the following three courses of conduct: (1) the clean-up effort at the elementary school immediately after the murder, (2) the removal and disposal of the body, and (3) the destruction and concealment of evidence at the defendant's home the day after the murder. *Id.* ¶¶ 41-42.

{15}     In this case, we uphold Defendant's five tampering convictions because Defendant tampered with each piece of evidence at a different time in a different place. Defendant dragged the victim's body into a closet at the crime scene.

8

Defendant disposed of the handgun near Tramway Boulevard and Interstate 25, nearly one-hundred feet away from the pavement. Defendant drove his car away from the scene of the crime and left it in a parking lot until the next day, when it was towed away with the assistance of his grandmother. Defendant removed the license plate from his car before it was towed and placed it in the trunk. The license plate was later found inside a closet at Defendant's grandmother's house. Finally, the wallet, which was on the victim's person when he was murdered, was disposed of in Tucson several days later. Unlike the convictions we vacated but like those we affirmed in *DeGraff* and *Saiz*, all five counts of tampering with evidence in this case were separated by sufficient indicia of distinctness, and we accordingly reject Defendant's double jeopardy challenge.

**B.      The District Court Did Not Abuse Its Discretion by Admitting Allegedly Prejudicial Evidence in Violation of Rules 11-403 and 11-404(B).**

{16}      Defendant challenges the district court's admission of the testimony of six witnesses; one writing referred to as the "Woo Script;" and evidence pertaining to Defendant's obsessions regarding the Mafia, being a hit man, and the Gambino crime family, arguing that the evidence was either inadmissible under Rule 11-404(B) or that its probative value was outweighed by its prejudicial, confusing, or misleading effects

9

under Rule 11-403. A trial court's decision to admit evidence under Rules 11-404(B) and 11-403 is reviewed for abuse of discretion. *State v. Otto*, 2007-NMSC-012, ¶¶ 9, 14, 141 N.M. 443, 157 P.3d 8. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case[,] . . . clearly untenable or not justified by reason." *Id.* ¶ 9 (internal quotation marks and citation omitted). We will first summarize the import of the challenged evidence and then address its admissibility.

### *1.    Summary of the challenged evidence*

{17}    Defendant challenges the testimony of six witnesses, including his ex-girlfriend Alexandra Dort-Urmann; three realtors, Chris Meyer, Avy Drum, and Rod Miller; and two men selling used luxury cars, Nicholas Woo and Steven Coe. The State counters that the testimony was not admitted to show Defendant's propensity to commit criminal acts in general but instead was probative of Defendant's planning, preparation, and identity as the killer.

{18}    Witness Alexandra Dort-Urmann was a German police officer who dated and lived with Defendant in Arizona from February through June 2003. During that time, the couple spent weekends shopping for luxury vehicles and expensive homes, although Dort-Urmann testified that Defendant could not afford to buy them.

Defendant told Dort-Urmann that "an acquaintance of his" wanted to kidnap and rob someone who had a lot of cash, like a realtor, car dealer, or defense attorney. Defendant stated that if someone did what his acquaintance suggested, he or she "would need to kill the person so there wouldn't be any eyewitnesses." Defendant asked Dort-Urmann questions pertaining to her law enforcement experience, including how police catch criminals and how to "fix somebody in a way that you can put handcuffs on him."

{19} Chris Meyer, a realtor from Arizona, testified that he met Defendant in December 2003 and helped Defendant shop for houses in Defendant's requested price range of five to ten million dollars. Over a period of six weeks, Defendant and Meyer looked at houses eight or nine times. Defendant sometimes brought a "bodyguard" with him and sometimes wore a bulletproof vest. The relationship between Meyer and Defendant ended in January 2004 when Meyer discovered that Defendant could not qualify to purchase the real estate that he was asking Meyer to show him.

{20} Two realtors from Albuquerque, Avy Drum and Rod Miller, testified that they had been contacted by Defendant during the summer of 2004 when the Taylor murder occurred. Drum testified that an individual named Mario Chavez called her and told her he was a "litigator" from Scottsdale, Arizona, had a family, and needed to get into

11

a house soon. Drum set up several appointments with Defendant, including one at 10:30 a.m. on August 16, 2004, the day of the murder; however, Defendant never showed up for any of them.

{21} At 8:38 a.m., on August 16, 2004, Miller received a phone call from a caller who identified himself as "Martin Cordova," the same name written on a business card found in the victim's pocket after the murder. "Cordova" explained that he was an attorney from Phoenix and needed a vacant house priced up to $850,000 that would be available right away. Miller asked "Cordova" to either call his office or come by to meet with him around 10:00 a.m., but Miller never heard from the caller again.

{22} Two witnesses testified at trial that they met with Defendant in Albuquerque on August 13, 2004, in order to show Defendant expensive Porsche automobiles they had for sale. Steven Coe was selling his 2001 Porsche 911 for $60,000. Nicholas Woo was selling his limited production 2001 Porsche 911 for $80,000. After looking at both cars, Defendant set up an appointment to purchase Woo's Porsche at about 10:00 a.m. on August 16, 2004, the day of the murder, but Defendant did not show up for the appointment.

{23} Defendant also challenges the admission of a writing referred to by the parties in their briefing as the "Woo Script." The "Woo Script" was a handwritten note that

appeared to be made in preparation for robbing Nicholas Woo. The note read, in relevant part, "Mr. Woo, I am not who you think I am. . . . My employer has contacted me to either execute you or collect from you money. . . . is there anyone in your house now. . . . if you are lying they will be killed." Although the State's handwriting expert determined that the script was written by Eloy Montano, the only fingerprint found on the script was from Defendant's left thumb.

{24} Finally, Defendant challenges the admission of evidence referring to the Mafia, Defendant's Mafia pseudonym "Mario Gambino," and Defendant's "fascinat[ion] with the life of a hitman." Both the State and Defendant introduced evidence at trial indicating that Defendant expressed an unusual fascination with the Mafia. Defendant testified that he and Montano had an interest in the Mafia that began in high school. Chris Meyer testified that Defendant represented to him that he was related to the Gambino mob family and sometimes used the alias "Mario Gambino." Defendant explained at trial that he began using the name Mario Gambino when he lived in Las Vegas, Nevada, and that the name became Defendant's "personage" at that time because he had a lot of money available to him, gambled a lot, and frequently rented expensive cars and hotel suites.

{25} Additionally, a computer forensic examiner who investigated Defendant's

13

laptop testified as to the contents of his laptop computer. Defendant's Internet browsing history during the month of the murder showed that he conducted specific Internet research on guns and silencers, being a hit man, New Mexico crime statistics, "best crimes," and disposing of bodies.

### 2. *Rule 404(B) "Bad Acts"*

**{26}** Defendant argues that the trial court abused its discretion under Rule 11-404(B) by admitting the evidence summarized in the previous section. Rule 11-404(B) provides in relevant part:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

In this case, the contested evidence was admissible to prove Defendant's planning, preparation, identity, and intent.

**{27}** Extrinsic evidence may be admissible as probative of a plan where the evidence proves "a larger act of which the defendant is charged." *State v. Gallegos*, 2007-NMSC-007, ¶ 27, 141 N.M. 185, 152 P.3d 828. All of the challenged testimony and the "Woo Script" served to support the State's theory that Defendant had been planning to live out his obsessive fantasies by robbing and killing a realtor or car

14

salesman long before Garland Taylor was murdered, and had progressed from preliminary preparations through shopping for potential victims to the final execution of his ill-conceived plan.

{28} The contested evidence was also relevant to show Defendant's identity. "[E]vidence is admi[ssible] under Rule 404(B) as evidence of identity only when . . . [t]he pattern and characteristics of the prior acts [are] so distinctive, in effect, to constitute the defendant's signature." *State v. Williams*, 117 N.M. 551, 558, 874 P.2d 12, 19 (1994) (third alteration in original) (internal quotation marks and citation omitted) (explaining that the defendant's enjoyment of anal sex was not so distinctive as to constitute a "signature"). In this case, Defendant's interactions with Meyer, Miller, Drum, Coe, and Woo all followed the same pattern. Each witness testified that Defendant represented himself as in the market for expensive homes or luxury cars, items which he was not in a position to actually pay for. In fact, Defendant scheduled alternative appointments with Drum, Miller, and Woo at approximately the same time on the same day the victim was murdered. Because the similarity between these acts was distinctive enough to constitute Defendant's signature, the evidence had probative value in helping the jury determine the killer's identity.

{29} Likewise, the evidence pertaining to being a hit man, the Mafia, and the

Gambino crime family was admissible under Rule 11-404(B) as extrinsic evidence to prove that Defendant killed the victim in this case. The evidence lends support to the State's theory that Defendant had a plan to rob and kill someone, carefully prepared for the crime, and had the requisite intent for first-degree murder. Defendant's preparation included Internet research on being a hit man, crime commission, and body disposal. The evidence also provided context to the State's theory that Defendant shopped for both the perfect crime and the perfect victim. *See Otto*, 2007-NMSC-012, ¶ 12 (explaining that "context may be a proper purpose under Rule 11-404(B)"). We conclude that the evidence was all admissible for proper specific purposes under Rule 11-404(B) and was not simply evidence of a general propensity to commit robbery or murder.

### 3. *Rule 11-403 Balance of Relevance and Prejudice*

{30} The trial judge also acted within his discretion under Rule 11-403 when he admitted the contested evidence. Under Rule 11-403, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." This determination is left to the sound discretion of the trial court judge, who is given

16

considerable leeway due to the fact-sensitive nature of such a ruling. *Otto*, 2007-NMSC-012, ¶ 14. The purpose of Rule 11-403 is not to exclude all harmful evidence, but instead to guard "against the danger of *unfair* prejudice. Evidence is not unfairly prejudicial simply because it inculpates the defendant. Rather prejudice is considered unfair when it goes *only* to character or propensity." *Otto*, 2007-NMSC-012, ¶ 16 (internal quotation marks and citations omitted). A trial judge lawfully has the discretion to admit even extremely harmful evidence where its probative value is very high. *See, e.g.*, *id.* ¶¶ 2-4, 15 (upholding the trial court's decision to admit evidence of the defendant's uncharged sexual acts against a child victim because the evidence was highly probative of absence of mistake or accident).

{31} In this case, the trial judge acted within his lawful discretion by ruling that the probative value of the contested testimony was not substantially outweighed by the danger of unfair prejudice or confusion of the issues.

**C.     The Trial Court Did Not Abuse Its Discretion in Admitting Three Out-of-Court Statements Introduced Through the Testimony of Dawn Pollaro.**

{32} Defendant also challenges the trial court's admission of three out-of-court statements admitted as hearsay exceptions through the testimony of Montano's wife, Dawn Pollaro. We review the trial court's decision to admit evidence under the

17

hearsay rules for abuse of discretion. *State v. Macias*, 2009-NMSC-028, ¶ 16, 146 N.M. 378, 210 P.3d 804.

**{33}** The three contested statements were all made on the day of the murder. Pollaro testified that she spent the morning at her sister's house. After eating lunch, Pollaro received a phone call from her husband and went home to meet him. When Pollaro walked in their front door, Montano was pacing, his hands were shaking, and he kept saying, "He set me up, he set me up, that fucker set me up." Pollaro testified that Montano "was a mess," "was crying," "was trembling," and that "his eyes were red." As Pollaro's conversation with her husband continued, Montano's phone rang four or five times. Montano told Pollaro, "it's Mario." When Montano finally answered his phone, Pollaro clearly heard the voice on the other end say, "you're in this with me now, you're in just as much trouble as I am. Your fingerprints are all on my car. You need to go out on a lam with me."

### 1. *Rule 803(B) Excited Utterance*

**{34}** The trial court ruled that Montano's statement, "He set me up, he set me up, that fucker set me up," was admissible under the excited utterance exception to the hearsay rule. An exited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or

18

condition." Rule 11-803(B) NMRA. "[T]he theory underlying the excited utterance exception is that the exciting event induced the declarant's surprise, shock, or nervous excitement which temporarily stills capacity for conscious fabrication and makes it unlikely that the speaker would relate other than the truth." *State v. Flores*, 2010-NMSC-002, ¶ 47, ___ N.M. ___, ___ P.3d ___ (No. 29,650, Jan. 5, 2010) (internal quotation marks and citation omitted).

{35} Defendant argues that the statement was improperly admitted as an excited utterance because Montano made the statement hours after the murder and therefore had "time to contrive and misrepresent." However, the determination of whether a statement qualifies as an excited utterance turns on the declarant's physical and mental condition at the time a statement is made; the amount of time elapsed between the startling event and the statement is not dispositive. *See State v. Lopez*, 1996-NMCA-101, ¶ 31, 122 N.M. 459, 926 P.2d 784 ("There is no set time period during which statements made are considered excited utterances. Instead, the test is whether the victim was under the stress and strain of the excitement . . . .") (internal citation omitted). The evidence showed that Montano was pacing, shaking, and crying when Pollaro came home and thus was still under the emotion caused by the preceding events when he made the statement. The trial court did not abuse its discretion by

admitting the statement under the excited utterance exception.

### 2. *Rule 803(A) Present Sense Impression*

{36}    The trial court also acted within its discretion when it admitted Montano's statement, "it's Mario," under the present sense impression exception to the hearsay rule.  A present sense impression is "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter."  Rule 11-803(A).  The present sense impression exception requires "that the statement be substantially contemporaneous with the event it is describing or explaining."  *Flores*, 2010-NMSC-002, ¶ 52.  Because Montano made the statement, "it's Mario," as he perceived the incoming phone call, the trial court did not abuse its discretion in admitting the statement under the present sense impression exception.

### 3. *Rule 801(D)(2) Admission by a Party-Opponent*

{37}    Finally, the district judge acted within his discretion in admitting the statements that Pollaro heard Defendant make to Montano in the overheard phone call, because a "[defendant]'s own statement, in either an individual or a representative capacity," is excluded from the basic definition of hearsay.  Rule 11-801(D)(2) NMRA.

{38}    The court's ruling depended upon whether there was "evidence sufficient to

support a finding" that Defendant was the speaker on the other end of the phone call. Rule 11-901(A) NMRA. Defendant argues that Pollaro could not identify him as the speaker because she had never met or spoken to Defendant previously. "Preliminary questions on admissibility of evidence such as the identity of a caller are determined by the trial judge under [Rule] 11-104(A), (B) [NMRA]." *State v. Garcia*, 110 N.M. 419, 425, 796 P.2d 1115, 1121 (Ct. App. 1990). "The identity of a party making a telephone call may be established by either direct or circumstantial evidence." *State v. Roybal*, 107 N.M. 309, 311, 756 P.2d 1024, 1026 (Ct. App. 1988).

**{39}** The record contains ample evidence to support a reasoned finding that Defendant was the speaker on the phone call with Montano. Montano positively identified the speaker as Defendant. Additionally, the substantive content of the conversation overheard by Pollaro supports a finding that Defendant was the speaker. Finally, the State introduced phone records at trial showing that seven phone calls were made from Defendant's phone to Montano's phone around the time that Pollaro overheard the conversation. The district judge did not abuse his discretion by admitting the testimony concerning the statements Defendant made in his phone call to Montano as an admission of a party-opponent.

**III.   CONCLUSION**

21

{40}     Finding no error in Defendant's convictions and sentences, we affirm the judgment of the district court.

**IT IS SO ORDERED.**


_____
**CHARLES W. DANIELS, Justice**


**WE CONCUR:**


_____
**EDWARD L. CHÁVEZ, Chief Justice**


_____
**PATRICIO M. SERNA, Justice**


_____
**PETRA JIMENEZ MAES, Justice**


_____
**RICHARD C. BOSSON, Justice**