Lawrence J. ETHELBAH, Appellant
and Cross–Appellee,

v.

Mary Sue WALKER f/k/a Ethelbah,
Appellee and Cross–Appellant.

Nos. S–12994, S–13013.

Supreme Court of Alaska.

Nov. 13, 2009.

As Corrected on Rehearing March 26, 2010.

Gregory W. Lessmeier, Lessmeier & Winters, Juneau, for Appellant and Cross–Appellee.

Chrystal Sommers Brand, Family Lawyer (An Alaska Corp.), Juneau, for Appellee and Cross–Appellant.

Before: FABE, Chief Justice, EASTAUGH, CARPENETI, WINFREE and CHRISTEN, Justices.

*OPINION*

CARPENETI, Justice.

# I. INTRODUCTION

A husband appeals the property division in his divorce. He argues that the trial court erred in distributing a retirement survivorship benefit by present value instead of by a qualified domestic relations order; in valuing a retirement health insurance benefit, an excavator machine, and two trucks; and in ordering recapture of marital income earned from his pension during the period of separation. The wife cross-appeals, arguing that the court erred in depriving her of the right to devise a pension survivorship benefit and in valuing a marital escrow account. We affirm the superior court's decision in all respects except its order that pension income paid to the husband during the separation period should be recaptured.

# II. FACTS AND PROCEEDINGS

## A. Facts

Lawrence Ethelbah and Mary Sue Walker married in Arizona in 1966. They divorced in October 2007. At the time of divorce, Lawrence was sixty-eight years old and Mary Sue was sixty-four. They had one adult son. During the marriage, Mary Sue worked for the Alaska Department of Education and for Alaska school districts. Lawrence worked for the United States Bureau of Indian Affairs. Lawrence retired from the federal government in 1994 and Mary Sue retired from state service in 1998. The Ethelbahs lived summers in Alaska and winters in a home in Pinetop, Arizona on an Apache Indian reservation. During retirement, the parties started two businesses that bought, sold, and leased machinery. Mary Sue was the corporate officer of both corporations.

On January 10, 2007, Mary Sue was diagnosed with breast cancer and underwent surgery and chemotherapy. The parties permanently separated on or about January 12, 2007. The separation was not amicable. Each party accused the other of stealing personal property from the estate. Lawrence filed an action in an Arizona tribal court seeking to have Mary Sue arrested for these alleged thefts. Mary Sue offered testimony (which the court called "believable") that she fled the Arizona home after Lawrence threatened her with a gun.

## B. Proceedings

The divorce trial was held October 11–12, 2007. Superior Court Judge Patricia A. Collins ordered the sale of several items of real and personal marital property, with the proceeds to be divided equally. Other property items were allocated to the parties, with the distribution to be balanced later by an equalizing payment. These included a number of vehicles, boats, trailers, pieces of heavy machinery, halibut fishing quotas, and other items. The court found that Lawrence had received but not shared certain marital funds during the period between separation and trial, including pension income, proceeds from halibut fishing quotas, income from rental properties, and proceeds from selling a Linkbelt excavator machine. The court placed these funds on Lawrence's side of the marital property ledger so they would be factored later into an equalizing payment.

At the time of the divorce, each party was receiving a defined benefit retirement pension. Mary Sue's was from the Teachers' Retirement System (TRS) and Lawrence's was a federal civil service pension. The trial court ordered that the marital portion of each party's pension benefits be divided equally by qualified domestic relations order (QDRO) or Court Order Acceptable for Processing (COAP).[1] Each party was also awarded survivorship benefits associated with the other spouse's pension, and they were to share the costs of the survivorship benefits.

Mary Sue also had a medical insurance retirement policy from TRS that the court determined to have a present value of $111,821. This policy provided a survivorship benefit to Lawrence in the form of lifetime medical coverage should he survive Mary Sue, which the court estimated had a present value to him of $45,064. Rather than distribute the TRS medical survivorship benefits by QDRO, the court used the present value estimates, placing $45,064 on Lawrence's side of the ledger in the tabulation of marital assets, and $111,821 on Mary Sue's side.

The court ordered that bank accounts, which likely contained more than $400,000, be divided equally after tracing by a jointly-selected CPA. The court prepared a property distribution table dividing the assets fifty-fifty "as closely as possible." An equalizing payment would be calculated after the CPA completed the tracing of the assets in the marital bank accounts. Later, however, the parties stipulated that there would be no tracing and that monies withdrawn from these accounts by the parties during the separation were used for reasonable living expenses.

## III. STANDARD OF REVIEW

▆▆ A trial court has broad discretion to provide for the equitable division of property between the parties in a divorce.[2] We review the trial court's equitable distribution under an abuse of discretion standard, and will reverse only if the division is clearly unjust.[3] We review a trial court's decision to classify property as marital for abuse of discretion, and review the court's underlying factual findings on classification and valuation of marital property for clear error.[4] Clear error exists when we are "left with a definite and firm conviction that the superior court has made a mistake."[5] We review questions of law de novo, adopting the rule of law that is most persuasive in light of precedent, reason, and policy.[6]

---

1. QDROs are orders that may be used to distribute TRS spousal benefits to a former spouse. Federal civil service pensions are divided by COAP. 5 C.F.R. § 835.305. Since the distinction between QDRO and COAP is not important for purposes of this case, we will refer to qualified orders for deferred division of both kinds of pensions as QDROs.

2. AS 25.24.160(a)(4); *Nicholson v. Wolfe*, 974 P.2d 417, 421 (Alaska 1999).

3. *Brotherton v. Brotherton*, 941 P.2d 1241, 1244 (Alaska 1997).

4. *Carr v. Carr*, 152 P.3d 450, 454 (Alaska 2007); *Doyle v. Doyle*, 815 P.2d 366, 368 (Alaska 1991).

5. *Josephine B. v. State, Dep't of Health and Soc. Servs., Office of Children's Servs.*, 174 P.3d 217, 220 (Alaska 2007) (citations omitted).

6. *Cox v. Cox*, 882 P.2d 909, 913 (Alaska 1994).

## IV. DISCUSSION

### A. The Superior Court Did Not Err in Assigning a Present Value to Lawrence's Survivorship Interest in Mary Sue's Retirement Health Insurance, Rather than Distributing It Through Qualified Domestic Relations Order.

Lawrence objects to the way the court distributed the health insurance survivorship benefit that he was entitled to under Mary Sue's retirement plan. He argues that the law prohibits distributing a survivorship benefit according to an estimate of present value, that doing so was unfair, and that it should have been distributed by QDRO instead. While we ordinarily prefer the QDRO method for distributing pension benefits,[7] the trial court retains discretion to use a present value distribution for vested pension benefits,[8] including survivorship benefits, where justified by the circumstances and the need for an equitable distribution.[9] We find the trial court did not abuse its discretion in this case.

An expert witness testified that Mary Sue's post-retirement medical insurance benefit had a present value of $111,821 to her, based on actuarial calculations given her age and history of cancer. The expert similarly estimated Lawrence's survivorship benefit from that insurance to have a present value worth of $45,064 to him. The court accepted these valuations and treated these amounts as marital property possessed by each party in its tabulation for the equitable division of property.

Lawrence argues that assigning a present value to the survivorship benefit places an unfair risk on him by crediting him with possession of $45,064 in marital property, even though he will receive this benefit only if he outlives Mary Sue and enjoys the benefit for the amount of time the expert predicted. He calls the benefit "speculative" and "highly contingent." Lawrence points out that the other survivorship benefits in this case were not assigned present values. Citing *Tanghe v. Tanghe*[10] and *Nicholson v. Wolfe,*[11] he says that it was error to capitalize this survivorship benefit because "doing so placed an unfair risk on the non-employee[ ] spouse and was inconsistent with the wait and see approach underlying the use of qualified domestic relation orders." He also cites *Laing v. Laing,*[12] in which we rejected the present value method of dividing non-vested pensions in favor of a QDRO approach.

Mary Sue argues that there was a good reason to treat the medical survivorship benefit differently from the other retirement benefits that were distributed by QDRO. Unlike those pension benefits, which provided each party a corresponding survivorship benefit, only Mary Sue had retirement health insurance benefits with a survivorship for the other spouse. Therefore there was no offsetting health insurance survivorship benefit that a QDRO could allocate to Mary Sue from Lawrence's retirement plan.

As we noted in *Laing,* courts have used two primary methods of valuing and dividing pension benefits upon divorce: the present value approach and the reserved jurisdiction approach.[13] In the present value approach, the court uses actuarial and other calculations to estimate how much the future receipt of pension benefits is worth to the beneficiary in present value dollars.[14] That amount is then awarded at the time of divorce, with an equalizing offset to the other

---

7. *See, e.g., Tanghe v. Tanghe,* 115 P.3d 567, 570 (Alaska 2005).

8. A pension is said to have "vested" at the point in time when an employee would still have a right to receive benefits even if he or she were to leave the employer immediately. Brett R. Turner, Equitable Distribution of Property § 6.2, at 6–7 (3d ed.2005).

9. *Mellard v. Mellard,* 168 P.3d 483, 487 (Alaska 2007).

10. 115 P.3d 567 (Alaska 2005).

11. 974 P.2d 417 (Alaska 1999).

12. 741 P.2d 649 (Alaska 1987).

13. *Id.* at 656.

14. *Id.* at 656–57.

party.[15] In contrast, we have called the QDRO a "wait and see" approach.[16] Unlike the present value, immediate offset approach, a QDRO provides that when the nonowning spouse becomes eligible for benefits in the future, the owning spouse or the pension plan pays him or her those benefits at that time.[17]

We have considered whether the superior court should use a QDRO or a present value distribution in several similar but distinct contexts. In *Laing*, we rejected the present value method of dividing nonvested pension benefits, because it "unfairly places all risk of possible forfeiture on the employee spouse." [18] In *Broadribb v. Broadribb*,[19] we affirmed the distribution of survivorship benefits in a vested retirement plan according to present value, albeit under unusual circumstances.[20] In *Nicholson*, we held that the choice between a present value and QDRO approach was within the trial court's discretion for the distribution of vested retirement benefits.[21] In *Tanghe*, we expressed disfavor for the present value method of distributing pension survivorship benefits,[22] although we did not actually hold that using it would necessarily be error. In *Mellard v. Mellard*,[23] we affirmed that a present value approach to distributing vested pension survivorship benefits lay within the trial court's discretion.[24]

■ Lawrence, citing *Laing* and *Tanghe*, argues that the present value approach is unfair because it means that the non-owning spouse "bears all the risk that the benefit may never be realized." It is true that a spouse in Lawrence's position bears the risk of *forfeiture*, that is, of getting nothing. Mary Sue gets her offset up front during the divorce, and Lawrence gets nothing unless he outlives her. However, as we noted in *Laing*, the situation changes when a pension vests, making a present value payout much less speculative and reducing the risk of forfeiture:

> [R]eserving jurisdiction does not necessarily mean that a protracted pay-out to the former spouse will follow vesting. Once vesting occurs, that portion of the pension which is marital property can be calculated as of the time of the divorce. The non-employee spouse's share of this figure may, in appropriate cases, be payable in a lump sum or in installments which do not particularly have to be keyed to the time that the pension benefits are actually received.[25]

Although the QDRO method is ordinarily preferable, the court in the present case had reasons of equity for taking a present value approach to this particular asset. Alaska's divorce statute calls for the division to "fairly allocate the economic effect of divorce" by taking into account several factors, including the station in life of the parties during the marriage, their age and health, earning capacity, and financial condition.[26] In this case, it is likely that Mary Sue will predecease Lawrence due to her age and breast cancer, and that Lawrence will thus benefit financially from the survivorship benefit. A present value distribution allows both parties to

15. *Id.* at 657.

16. *Tanghe v. Tanghe*, 115 P.3d 567, 568–69 (Alaska 2005).

17. 2 TURNER, *supra* note 8, § 6:30, at 192. A domestic relations order granting property rights to the pension owner's spouse is "qualified" if it is determined by the pension plan administrator to comply with the requirements of federal law. *See id.* § 6:19, at 96–98.

18. *Laing*, 741 P.2d at 657–58.

19. 956 P.2d 1222 (Alaska 1998).

20. *Id.* at 1227. *Broadribb* dealt with a couple that married and lived in England before moving to Alaska, and the trial court ruled that under British law the pension and survivorship benefits were not subject to QDRO or division by the court. *Id.* *Broadribb* thus did not deal with a situation where the court had a choice between a present value and a QDRO approach.

21. *Nicholson v. Wolfe*, 974 P.2d 417, 425–26 (Alaska 1999).

22. *Tanghe v. Tanghe*, 115 P.3d 567, 568–71 (Alaska 2005).

23. 168 P.3d 483 (Alaska 2007).

24. *Id.* at 487.

25. *Laing v. Laing*, 741 P.2d 649, 657 (Alaska 1987).

26. *See* AS 25.24.160(a)(4).

share this marital asset during their lifetimes. The trial court was consistent in its treatment of this retirement health insurance benefit, crediting Lawrence with the estimated present value of the survivorship benefit, but also crediting Mary Sue with the estimated present value of her insurance coverage. The court did not abuse its discretion in distributing these benefits.

### B. The Superior Court Did Not Err in Its Valuation of Mary Sue's Retirement Health Insurance Benefits.

The court valued Mary Sue's postretirement medical insurance benefit at $111,821. Lawrence argues that the court undervalued this asset. He cites *Hansen v. Hansen*[27] to argue that the superior court failed to "look to the amount of the premium subsidy provided by the employer, rather than to either the proceeds or the cost of procuring comparable insurance."[28] We conclude that the trial court did not err and followed the *Hansen* requirement to base the valuation on the amount of the employer premium subsidy.

An expert witness provided three different ways of estimating the value of the health insurance benefit. The court selected the middle estimate of $111,821 based on what the expert termed the "individual rate." Lawrence argues that the court should have chosen a higher estimate based on the so-called "composite rate," which would have placed the value at $166,026.[29]

Retirement medical insurance for TRS members is provided by AlaskaCare, a health insurance plan funded by the State of Alaska Retiree Health Fund, and administered by the State's Division of Retirement and Benefits.[30] The State of Alaska's Commissioner of Administration sets premiums to cover estimated costs of claims to be paid in the coming year. Mary Sue's expert witness described the difference between the use of the "individual rate" and the "composite rate" for estimating the employer premium subsidy:

> The individual rate approaches reflect what *Ms. Ethelbah would pay to the Teachers' Retirement Fund,* if she were required to pay premiums (for herself only). The composite rate reflects what *TRS pays from the Teachers' Retirement fund* to the State of Alaska Retiree Health Fund. Each month during 2007, employers participating in the [Teachers' Retirement System] pay $876 per benefit recipient . . . to the Retiree Health Fund. (Emphasis in original.)

TRS paid the composite rate of $876 per month per employee to cover its Tier I employees such as Mary Sue. Because Mary Sue was a Tier I TRS member, she received fully subsidized health insurance. Employees in certain other categories (which are determined based on factors such as date of hire) have to pay their own premiums.[31] Individual employees without dependents who purchased their own insurance paid the individual rate of $590 per month.

The expert testified that the composite rate is higher than the individual rate because it is based on an average cost of coverage for all employees that "includes not only coverage of the participant, but also spouses and minor children. So this results in the composite rate being about 50 percent higher than the individual rate." Thus, the composite rate is actually a less precise measure than the individual rate as to how much it costs TRS to insure Mary Sue. The expert witness observed that the composite rate "is a weighted average that reflects the value and incidence of coverage of spouses and children, as well as the retiree." It takes into account not only the coverage of spouses

---

**27.** 119 P.3d 1005 (Alaska 2005).

**28.** *Id.* at 1016.

**29.** Neither party argues the lowest of the three estimates, referred to as the "post–65" rate, should have been chosen. The "post–65" rate attempts to factor in the cost savings for retirees in the health plan as a result of receiving Medicare.

**30.** State of Alaska Retiree Health Fund, Financial Statements, June 30, 2007 and 2006, available at http://doa.alaska.gov/drb/ghlb/retiree/pdf/fs07rhf.pdf.

**31.** *See id.*

and dependents, but also the probability that a given individual will acquire a new spouse or new children in the future.

The assumptions inherent in the composite rate, for dealing with unknown future familial status, are not applicable to Mary Sue. It was known that Mary Sue was sixty-four years old and had breast cancer, making her less likely than the average insured to remarry or acquire additional dependent children. The composite rate is better viewed not as the size of the subsidy provided to an individual like Mary Sue, but as an estimate of average per-employee costs for all insureds, used to assure that in aggregate TRS pays Alaska-Care enough to cover the claims of its entire pool of insureds. Thus, the expert witness concluded that in Mary Sue's case, the individual rate would be more appropriate than the composite rate because the composite rate would likely overstate the cost of Mary Sue's coverage:

> The composite rate primarily reflects the probability of marriage, remarriage following divorce. And I think to some extent a person would want to discount that where a person has a life-threatening illness. So I think, in this case, given Ms. Ethelbah's breast cancer, one might want to shy away from the composite rate.

The expert testified that in his view both the individual and composite rates were different ways of estimating the employer's premium subsidy in accord with the *Hansen* mandate. As the trial court concluded, the individual rate "most closely approximates the likely premium rate charged by the State for estimated costs of claims, given Ms. Walker's life expectancy and personal circumstances." We conclude that the court did not err as a matter of law or make any erroneous factual findings in adopting the individual rate calculation to value this asset.

**C. It Was Error To Order Recapture of Pension Income Lawrence Received During the Separation Without Finding that the Income Was Wasted, Dissipated, or Converted to Non-Marital Form.**

Both parties received monthly retirement income after they separated, which the court classified as marital property. Lawrence's pension payments were higher than Mary Sue's by $1,216 per month. This monthly difference in retirement income totaled $10,945 during the period between separation and trial. The trial court concluded that Lawrence "failed to share this marital asset," and placed a $10,945 marital property credit on Lawrence's side of the property distribution table. We conclude that it was error to order recapture of these funds without making sufficient findings based on evidence that the funds had been dissipated, wasted, or converted to non-marital form.

The party that controls a marital asset during separation may have to compensate the other party if he or she dissipates or wastes the asset or converts it to non-marital form.[32] The marital asset is not considered to have been dissipated, wasted or converted if it was expended "for marital purposes or normal living expenses."[33] In a majority of courts, "[t]he spouse claiming dissipation bears the burden of proving the first two elements of dissipation—the fact that the asset in question existed, and the fact that it was lost during or after the marital breakdown."[34] Once that burden is met, the burden shifts to the owning spouse to show that he or she did not dissipate the asset.[35]

An order of recapture is thus not justified without findings of fact that the assets in question were actually wasted, dissipated, or converted to non-marital form.[36]

**32.** *Foster v. Foster*, 883 P.2d 397, 400 (Alaska 1994).

**33.** *Jones v. Jones*, 942 P.2d 1133, 1139 (Alaska 1997).

**34.** 2 Turner, *supra* note 8, § 6:105, at 557.

**35.** *Id.*

**36.** *See Korn v. Korn*, 46 P.3d 1021, 1023 (Alaska 2002) ("Although we have sometimes recognized that orders dividing marital property may recapture a marital asset's pre-trial loss in value, we have held that such orders must be supported by findings that the asset's value was dissipated, wasted, or converted to a non-marital form by the party who controlled the asset during the period of separation.") (internal citations omitted); *Foster*, 883 P.2d at 400 ("Where there is

These findings cannot be merely conclusory, but must be based on evidence. In *Ogden v. Ogden*,[37] we noted that "[o]rdinarily, . . . neither party is charged for loss in the value of marital property occurring in the interim between separation and trial."[38] However, "we have occasionally recognized an exception that allows recapture of property that has been dissipated or wasted in the interim between separation and trial" where there are "exceptional circumstances" warranting recapture.[39] In *Brandal v. Shangin*,[40] we vacated a trial court's recapture of Exxon Valdez settlement monies paid to the husband during separation because "[i]t was error to charge the settlement amount . . . without first conducting a recapture analysis."[41] In *Foster v. Foster*,[42] we reversed an order recapturing pension payments received by the husband after separation but spent by the time of trial.[43] We held that the trial court "erred . . . in 'recapturing' the payments which had been made to and spent . . . before trial without making findings that circumstances existed which warranted their recapture."[44]

In this case, the trial court appears to have inferred the dissipation, waste, or conversion of the pension income solely from the fact that Lawrence had a larger income than Mary Sue during the period of separation, and that his various sources of income, taken together, exceeded his living expenses. However, the court did not cite any evidence or make any findings about what Lawrence actually did with his pension income. The court does not appear to have considered the possibility that Lawrence deposited any pension income beyond his normal living expenses into marital bank accounts, as Lawrence asserts in his brief. These marital bank accounts likely contained more than $400,000 at the time of trial. It appears that no tracing of withdrawals or deposits was made because the parties stipulated that withdrawals from these accounts were for reasonable living expenses. If Lawrence did deposit any excess pension income into marital bank accounts, it would be double-counting to order its recapture because these accounts were divided equally. We conclude there were insufficient findings supporting the order of recapture.

**D. The Superior Court Did Not Clearly Err in Its Valuation of the Linkbelt Excavator.**

■ After separation, Lawrence sold an item of marital property, a Linkbelt excavator, without notice to or the consent of Mary Sue. The court found that the sale was an unjustified dissipation of marital assets and that Lawrence had sold it for "far less than market value." It added the "fair market value," which it set at $92,000, to Lawrence's side of the marital property ledger. In his points on appeal, and in the headings of his brief, Lawrence disputes both the conclusion that he dissipated this asset and the valuation. However, in his brief he provides arguments regarding only the valuation. We therefore treat the dissipation issue as waived and focus on the valuation question.[45] We conclude the court did not commit clear error in this valuation.

■ When a marital asset is sold after separation and there is evidence that the asset was wasted or converted to nonmarital form, the court may recapture the asset by crediting all or part of its value to the account of the party who controlled the asset.[46] The court accepted Mary Sue's estimate of

evidence that a marital asset was dissipated, wasted, or converted to a non-marital form, the court can 'recapture' the asset. . . .").

37. 39 P.3d 513 (Alaska 2001).

38. *Id.* at 521.

39. *Id.*

40. 36 P.3d 1188 (Alaska 2001).

41. *Id.* at 1194–95.

42. 883 P.2d 397 (Alaska 1994).

43. *Id.* at 400.

44. *Id.*

45. *Shearer v. Mundt*, 36 P.3d 1196, 1199 (Alaska 2001) ("[I]ssues not briefed or only cursorily briefed are considered waived.").

46. *Jones v. Jones*, 942 P.2d 1133, 1139 (Alaska 1997).

$92,000, while Lawrence argued that the fair market value was $51,156.

Mary Sue argued that the excavator was purchased for $98,085. Lawrence did not dispute this. It was three and a half years old at the time Lawrence sold it to a broker for $54,240. However, what he actually received was $25,865 in cash and a sawmill that he testified was worth $26,400. This totals $52,265, so it is unclear why he also states that the sales price was $54,240. In any event, he put its value at $51,156, so he said the price he got was a "good deal." Mary Sue estimated its value at the time of sale at $92,000, based on the excavator's low number of hours, and its excellent condition, and her familiarity with this kind of equipment.

In explaining why $54,240 (or less) reflected fair market value, Lawrence factored in a twelve percent annual depreciation rate, along with a ten percent brokerage fee. Mary Sue testified that Lawrence overstated the amount of depreciation because the machine "only had 71.6 hours on it. So that is very low mileage.... This is a practically new machine...."

▆▆▆▆ Lawrence argues that Mary Sue "did not support her opinion of the excavator's value with any documentation or any informed third-party opinion." While that is true, the same can be said of Lawrence's opinion of the excavator's value. In general, the opinion of a lay owner as to the value of his or her property is admissible evidence.[47] The evidentiary weight to be accorded such opinion and the adequacy of its foundation "are matters which fall squarely within the trial court's discretion."[48] Mary Sue was the corporate officer of the Ethelbahs' equipment leasing and sales companies, and was involved in the buying and leasing of its equipment. The trial court accepted her valuations of all the heavy equipment assets at issue, finding her testimony on their value "more credible" than Lawrence's. On appeal, we "will generally accept the determination of witnesses' credibility that are made by the court as a trier of fact, since the court heard and observed the witnesses first hand."[49]

▆▆▆▆ Part of Lawrence's argument is that the court erred by ignoring depreciation. We have held that we "disapprove[ ] of property divisions which fail to consider appreciation and depreciation."[50] However, in this case, the court did not fail to consider depreciation. Rather, it credited Mary Sue's testimony regarding the condition of the machine and the amount of depreciation. Given conflicting testimony, it is not error for the trial court to decide which testimony it finds more credible. "Evidence of the price paid for personal property is probative of value where there has been no substantial change in the property's condition in the interim."[51]

▆▆▆▆ Lawrence also faults the trial court for failing to consider the ten percent broker's fee. However, Lawrence offered no explanation of why it was necessary to use a broker to sell the excavator. The most likely explanation is that Lawrence was in a hurry to sell the excavator and therefore chose to use a broker for his own benefit. He sold the machine to a broker a week before he filed the complaint for divorce, taking $2,000 in "earnest money." A week later, the court issued a domestic relations order prohibiting the sale of marital assets. Several weeks later he received the cash and the sawmill, minus the broker's fee. When asked why he sold the excavator, and why he could not get more money for it, he said,

> I knew this was going to become a very costly divorce, and [I] wanted the sawmill worse than I did the excavator. So I thought, well, a 50/50 split between the cash and the sawmill would be a good deal for me. And ... I don't have any more work under [the machinery company].

**47.** *Schymanski v. Conventz*, 674 P.2d 281, 286 (Alaska 1983).

**48.** *Id.*

**49.** *Dodson v. Dodson*, 955 P.2d 902, 907 (Alaska 1998) (quoting *Demoski v. New*, 737 P.2d 780, 784 (Alaska 1987)).

**50.** *Zimin v. Zimin*, 837 P.2d 118, 122 (Alaska 1992).

**51.** 31A C.J.S. Evidence § 339, at 478 (2008) (citing *Esteel Co. v. Goodman*, 82 N.C.App. 692, 348 S.E.2d 153 (1986)).

She owns [that] company. And so I sold the excavator, and I sold it for what I felt like was well within fair market value ...

I've got a bunch of logs to mill here.

Because Lawrence likely used a broker to further his own financial gain rather than to maximize the return on the sale, it was within the court's discretion to view the expenditure of the broker's fee as a dissipation of marital assets.

### E. The Superior Court Did Not Clearly Err in Its Valuation of Two Trucks.

 In his points on appeal, Lawrence asserts that the court erred in concluding that the parties owned a 2006 John Deere loader motor and in assigning its value to Lawrence. He also claims the court erred in its valuation of several trucks in Lawrence's possession, and that it erred in not ordering them sold so the proceeds could be divided equally. Lawrence has abandoned several of these issues by not arguing them in his brief,[52] but two remain: the valuations of a 1995 Dodge Ram pickup truck and a 1999 Ford pickup truck. We conclude the court did not err in valuing these assets. The court adopted the values for these vehicles proposed by Mary Sue, which it found "generally track Blue Book when available."

#### 1. Value of the 1999 Ford truck

Mary testified that she looked up "Blue Book" values for each of the vehicles (although it appears she actually looked up the values on the website AutoTrader.com). The court accepted the value of $10,000 for the 1999 Ford truck Mary Sue researched in this way. She testified that the estimate was based on her classification of the Ford as being in "very good" condition. Lawrence does not agree the truck is worth $10,000. He testified that he had been trying to sell it for $9,000 without success, and then reduced the price to $7,000 and "nobody's called me yet." Therefore, he concludes that the truck would probably sell for $6,000. He testified that it was formerly a Forest Service truck

and as such had an uncomfortable bench seat, and that the air conditioning did not work.

The court was thus faced with conflicting testimony about the condition and value of this truck. It concluded that Mary Sue's estimates "generally track Blue Book when available" and that her testimony was "far more credible" than Lawrence's regarding the value of the vehicles. As noted above, we generally defer to the finder of fact with regard to the credibility of witnesses.[53] We conclude it was not clearly erroneous to accept Mary Sue's estimate of the market value of this truck.

#### 2. Value of the 1995 Dodge truck

The court also adopted the $8,500 value Mary Sue estimated for the value of the 1995 Dodge truck. It is not clear from the record how she classified its condition when she looked up its market value. Lawrence testified that this truck was not worth the book value because it was inoperable due to a leaky transmission. He testified that a repair service, A–1 Transmission, estimated a repair cost of $5,500. He offered into evidence a photo of the truck showing a pool of liquid underneath it, which he testified was transmission fluid.

In valuing the Dodge truck according to its book value, the trial court evidently chose to discount Lawrence's testimony about the condition of the transmission. Again, the court had to base its valuation on the credibility of the witnesses. As noted already, it did not find Lawrence as credible as Mary Sue on the value of the vehicles, and we generally defer to the finder of fact with regard to the credibility of witnesses.[54] We have also held that "it is the duty of the parties, not the court, to ensure that all necessary evidence is before the court in divorce proceedings and that a party who fails to present sufficient evidence may not later challenge the adequacy of the evidence

**52.** *See Vezey v. State,* 798 P.2d 327, 336 (Alaska 1990); *Kodiak Elec. Ass'n, v. DeLaval Turbine,* 694 P.2d 150, 153 n. 4 (Alaska 1984).

**53.** *Dodson v. Dodson,* 955 P.2d 902, 907 (Alaska 1998).

**54.** *Id.*

on appeal."[55] Given that Lawrence's challenge to the court's valuation is based only on his own testimony, that the court doubted the credibility of this testimony, and that such judgments of credibility are afforded strong deference, we find that the court's valuation of the Dodge truck was not clearly erroneous.

### F. The Superior Court Did Not Err in Taking Mary Sue's Right To Devise Her Share of Lawrence's Retirement Benefits to her Heirs.

The distribution of Mary Sue's TRS retirement plan is governed by a QDRO, under which in the event the non-owning spouse, Lawrence, predeceases the owning spouse, Mary Sue, then Lawrence's share of the plan benefits must revert to Mary Sue.[56] In order to balance this out, the court attempted to fashion a symmetrical treatment of Lawrence's retirement plan. It ordered that for Lawrence's pension, if the non-owning spouse, Mary Sue, predeceased Lawrence, then Mary Sue's share of the plan benefits would revert to Lawrence. Mary Sue argues that this order deprives her of her "full property interest" in Lawrence's pension and that she should have retained the right to devise her share of the benefits to her heirs or estate.

Mary Sue cites the cases of *Wahl v. Wahl*[57] and *Zito v. Zito*[58] for the proposition that an award of retirement benefits in a divorce must include the "full benefit of her property interest," including "the right to devise her share to her children." She also cites Turner's treatise to the effect that most courts grant a non-owning spouse the right to devise retirement benefits awarded in a di-

vorce, in keeping with the principle that "deferred distribution is a full transfer of all ownership rights, including the right to devise to an heir."[59]

However, Mary Sue misconstrues these authorities, none of which states or implies that a court must always award to one party the full suite of property interests associated with a given pension. Trial courts have broad discretion to reallocate property rights in pursuit of equitable division.[60] Alaska's divorce statute provides:

> [T]he court, in making the division, may invade the property . . . of either spouse acquired before marriage when the balancing of the equities between the parties requires it; and to accomplish this end the judgment may require that one or both of the parties assign, deliver, or convey any of their real or personal property, including retirement benefits, to the other party; the division of property must fairly allocate the economic effect of divorce. . . . [61]

Neither of the main cases cited by Mary Sue, *Wahl* and *Zito*, limits the discretion of the court to alter existing property rights associated with a pension. The only question posed in those cases was whether an award of retirement benefits under a divorce agreement should be construed as including associated property rights such as survivorship benefits and devisability where the agreement was silent on that question.[62] In other words, these items should be treated like other kinds of property, and should ordinarily carry the full suite of property rights unless otherwise stated. As Turner's treatise notes, the fact that pension benefits awarded in divorce are ordinarily devisable is "merely another application of the general

---

**55.** *Root v. Root*, 851 P.2d 67, 69 (Alaska 1993).

**56.** The Alaska Division of Retirement and Benefits requires this arrangement—reversion back to the owner in the event the non-owning spouse dies—for many of the pension plans it oversees, including TRS pensions. *See* ALASKA DIVISION OF RETIREMENT AND BENEFITS, STATE OF ALASKA QUALIFIED DOMESTICE RELATIONS ORDER (QDRO) DIVORCE AND DISSOLUTION INFORMATION PACKET 8, 16 (January 2006) (applying to TRS pensions, and requiring reversion as a minimum requirement of any QDRO), *available at* http://doa.alaska.gov/drb/forms/pdf/qdro-booklet.pdf.

**57.** 945 P.2d 1229 (Alaska 1997).

**58.** 969 P.2d 1144 (Alaska 1998).

**59.** *See* 2 TURNER, *supra* note 8, § 6.33, at 213–14.

**60.** *Nicholson v. Wolfe*, 974 P.2d 417, 421 (Alaska 1999).

**61.** AS 25.24.160(a)(4).

**62.** *Wahl*, 945 P.2d at 1232; *Zito*, 969 P.2d at 1147–48.

rule that deferred distribution is a full transfer of all ownership rights, including the right to devise to an heir." [63]

None of these authorities states or implies that a court lacks discretion to award a spouse something less than the full bundle of property rights normally associated with a pension plan, any more than it lacks such discretion with regard to other property such as a house or business. To take the example of a house, a party awarded title to a house ordinarily gains the rights of occupancy and devisability. However, trial courts may separate and reallocate the bundle of property rights associated with the marital home. For example, a court may award a spouse raising children an exclusive right of occupancy during the minority of the children without granting him or her a right to devise the house to heirs.[64] Similarly, an award of a pension benefit is ordinarily an award of all the property rights associated with that benefit, and in most circumstances such an award is preferable. However, a court has discretion to do otherwise where circumstances make that more equitable. The court's order to have Mary Sue's portion of Lawrence's pension benefits revert to him if Mary Sue predeceased him was not an abuse of that discretion. The court ordered this because it was attempting as nearly as possible to divide the marital estate equally, and this arrangement made the benefit Mary Sue received from Lawrence's pension more closely resemble the benefit Lawrence received from Mary Sue's pension.

Mary Sue's other argument against making her portion of the pension revert to Lawrence upon her death is that she wants to be "free of any control or entanglements with Lawrence." She says she is fearful of Lawrence and cites some incidents in which she says Lawrence physically threatened her, including one in which he threatened her with a gun. It is true that we have stated a "strong policy 'to disentangle fully inter-spousal affairs upon dissolution.' " [65] But the trial court's order does not require that Mary Sue have any contact with Lawrence, nor does it create any more entanglement than the parties have as a result of the survivorship interest that exists with respect to Mary Sue's retirement plan; the order merely makes Mary Sue's survivorship benefit mirror Lawrence's survivorship benefit. We see no reason why this arrangement would unacceptably "entangle" Mary Sue's affairs with Lawrence's or bring the two into unwanted contact.

## G. The Superior Court Did Not Clearly Err in Failing To Value the Roswell Escrow as of the Date of Separation.

The Ethelbahs had an escrow account containing proceeds from the sale of real property near Roswell, New Mexico. At trial, Lawrence introduced into evidence a statement from the escrow company indicating that the account had a balance of $5,298 as of May 1, 2006. The trial court credited this $5,298 to Mary Sue's side of the marital property ledger. Mary Sue objected that this overvalued the account, which she claims was worth only $3,403 at the date of separation. The court concluded that it was using "the most recent valuation available at trial." Mary Sue appeals this determination.

The date of the account statement relied upon by the court was May 1, 2006, which was about eight and a half months before the separation date of January 12, 2007. Mary Sue arrives at the lower figure of $3,403 by taking the monthly amount that was being dispersed from the account and multiplying it by the number of months from May 1 to the date of marital separation, and then subtracting that total ($1,896) from the known May 1 balance shown on the account statement.

Mary Sue is almost certainly correct that the account was worth less at the time of

**63.** 2 TURNER, *supra* note 8, § 6:33, at 214.

**64.** *See id.,* § 6:85, at 444–45 (noting that a court "can recognize one spouse's special need for the marital home by awarding that spouse exclusive use of the home and its contents" until the emancipation of the youngest minor child, at which point the occupying spouse could purchase the

home or it could be sold and the proceeds divided).

**65.** *Musgrove v. Musgrove,* 821 P.2d 1366, 1370 n. 7 (Alaska 1991) (quoting *Voyles v. Voyles,* 644 P.2d 847, 849 (Alaska 1982)).

trial than the amount it was valued at by the court. It is not clear why Mary Sue argues that the date of separation should be used, rather than the date of trial. However, there is no dispute the account contained less than the $5,298 valuation used by the court. Lawrence agreed that there had been some monthly payments out of the account after May 1, although Lawrence disputes the number and amount of those payments. Mary Sue testified that based on a conversation with the escrow company, she expected to receive the balance of the account in a check for "about 4,200." Lawrence estimated in his own testimony the balance was "4,000–something."

 It is true that the date on which the trial court values marital property generally should be "as close as practicable to the date of trial." [66] However, "as close as practicable" is an important qualifier. It was not clearly erroneous to view the amount on the escrow statement admitted into evidence as being the best estimate as close as practicable to the date of trial. If Mary Sue did not want to use that statement, she could have obtained and introduced a more recent statement. We have held that "it is the duty of the parties, not the court, to ensure that all necessary evidence is before the court in divorce proceedings and that a party who fails to present sufficient evidence may not later challenge the adequacy of the evidence on appeal." [67] The court's only alternative to using the $5,298 figure based on the May 1, 2006 escrow statement would have been to pick a number out of the air that roughly matched the parties' back-of-the-napkin calculations. The court reasonably relied on the most recent solid evidence it had of the value of the escrow account.

## V. CONCLUSION

 While we generally favor use of a QDRO to distribute pension benefits, a present value distribution of vested pension benefits, including survivorship benefits, is not barred where circumstances make that method more equitable. Because only Mary

Sue had a retirement health insurance benefit, and given her shorter life expectancy, the trial court did not abuse its discretion in making a present value award of her retirement health insurance and Lawrence's survivor interest in that benefit. We also conclude that the court properly based its valuation of Mary Sue's retirement health insurance on the amount of the employer subsidy. Because we defer to the trial court in its assessment of witness credibility, and because it is the obligation of the parties to produce sufficient valuation evidence, we conclude that the court did not clearly err in its valuation of the excavator, two trucks, and the "Roswell" escrow account. Although an award of pension benefits is normally devisable, we conclude the trial court did not err in making Mary Sue's interest in Lawrence's pension benefits non-devisable, because courts retain broad discretion to reallocate property rights in pursuit of an equitable property division. It was error, however, to order recapture of pension income Lawrence received during the separation period, because there were no findings that he wasted, dissipated, or converted these assets to non-marital form. We therefore VACATE the order for recapture of these funds, and REMAND for the trial court to reconsider the distribution of these assets. It should only order recapture if it can make evidence-based findings that Lawrence dissipated, wasted, or converted the disputed income to non-marital form. We AFFIRM on all the other issues raised in this appeal.

---

66. *Ogard v. Ogard,* 808 P.2d 815, 819 (Alaska 1991).

67. *Root v. Root,* 851 P.2d 67, 69 (Alaska 1993).